1  EMMETT C. STANTON (CSB No. 83930)
   AARON MYERS (CSB No. 200145)
2  FENWICK & WEST LLP
   801 California Street
3  Mountain View, CA 94041
   Telephone: (650) 988-8500
4  Facsimile: (650) 938-5200
   estanton@fenwick.com
5  amyers@fenwick.com

6  BRYAN A. KOHM (CSB No. 233276)
   FENWICK & WEST LLP
7  275 Battery Street, 16th Floor
   San Francisco, CA 94111
8  Telephone: (415) 875-2300
   Facsimile: (415) 281-1350
9  bkohm@fenwick.com

10 SHIRLEY HOCHHAUSEN (CSB No. 145619)
   COMMUNITY LEGAL SERVICES IN EAST PALO ALTO
11 2117-B University Avenue
   East Palo Alto, CA 94303
12 Telephone: (650) 326-6440
   Facsimile: (650) 326-9722
13 s_hochhausen@hotmail.com

   **C 05 00240**

14 Attorneys for Plaintiffs NONA KNOX, ALBERT KNOX, MARIA
   TORRES, HELADIO ARELLANES AND MARIA ARELLANES
15

16              UNITED STATES DISTRICT COURT

17     NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

18 NONA KNOX, ALBERT KNOX, MARIA        | Case No.
   TORRES, HELADIO ARELLANES AND        |
19 MARIA ARELLANES on behalf of         | **CLASS ACTION**
   themselves and those similarly situated, |
20                                       | **COMPLAINT FOR VIOLATIONS OF THE**
              Plaintiffs,                | **TRUTH IN LENDING ACT (15 U.S.C. § 1601**
21                                       | ***ET SEQ.***); **THE REAL ESTATE**
       v.                               | **SETTLEMENT AND PROCEDURES ACT**
22                                       | **(12 U.S.C. § 2601 *ET SEQ.*); THE FAIR**
   AMERIQUEST MORTGAGE                  | **HOUSING ACT (42 U.S.C. § 3601 *ET SEQ.*);**
23 COMPANY, a Delaware corporation,     | **THE EQUAL CREDIT OPPORTUNITY ACT**
   ARGENT MORTGAGE COMPANY,             | **(15 U.S.C. § 1691 *ET SEQ.*); THE UNRUH**
24 LLC, a Delaware Limited Liability    | **ACT (Cal. Civ. Code § 51); CALIFORNIA**
   Company, AND DOES 1-100, inclusive,  | **BUSINESS & PROFESSIONS CODE § 17200**
25                                       | ***ET SEQ.*; CALIFORNIA BUSINESS AND**
              Defendants.               | **PROFESSIONS CODE § 17500 *ET SEQ.*;**
26                                       | **THE CONSUMERS LEGAL REMEDIES**
                                         | **ACT (Cal. Civ. Code § 1750 *ET SEQ.*);**
27                                       | **UNJUST ENRICHMENT; DECLATORY**
                                         | **RELIEF; AND INJUNCTIVE RELIEF**
28                                       |
                                         | **DEMAND FOR JURY TRIAL**

COMPLAINT



1    Plaintiffs Nona Knox, Albert Knox, Maria Torres, Heladio Arellanes and Maria Arellanes

2    (collectively "Plaintiffs") hereby allege for their Complaint against Ameriquest Mortgage

3    Company ("Ameriquest"), Argent Mortgage Company ("Argent") and Does 1 through 100,

4    inclusive (collectively "Defendants"), as follows:

5                                    **INTRODUCTION**

6          1.    Defendants were and are engaged in unfair, unlawful and deceptive business

7    practices in soliciting, inducing and closing residential loan transactions in the State of California

8    and nationwide.

9          2.    During loan transactions, Defendants fail to provide required disclosures,

10   including the statutorily mandated Notice of Right to Cancel, and, without the applicants'

11   knowledge or consent, falsify income stated on loan applications so that borrowers qualify for

12   larger loans than they can afford.

13         3.    Through predatory lending practices, Defendants wrongfully induce borrowers to

14   take residential mortgages that saddle borrowers with principal amounts Defendants know or

15   should know the borrowers' income cannot support, and then charge the borrowers expensive

16   origination fees and expenses.

17         4.    Defendants engage in a pattern of discriminatory conduct—targeting borrowers on

18   the basis of race, national origin, age and gender—and provide those borrowers less favorable

19   terms and conditions in loan contracts than would be provided but for the borrowers' race,

20   national origin, age and/or gender.

21         5.    Defendants engage in a "bait and switch" scheme:  Defendants represent to

22   borrowers that their loans will have certain terms and conditions, then induce borrowers to sign

23   mortgage contracts consisting of significantly less favorable terms and conditions, while at the

24   same time misleading the borrowers about those terms and conditions.

25                                    **PARTIES**

26         6.    Plaintiffs Nona and Albert Knox ("Mr. and Mrs. Knox") were at all relevant times

27   residents of East Palo Alto, California.  Mrs. Knox is a resident of East Palo Alto, California,

28   African-American and a senior citizen.  Mr. Knox was a resident of East Palo Alto, California,

COMPLAINT

1    African-American and a senior citizen. Mr. Knox is deceased. His widow, Mrs. Knox, maintains

2    this action on behalf of his estate.

3        7.    Plaintiff Maria Torres ("Mrs. Torres") is and at all relevant times was a resident of

4    East Palo Alto, California. Mrs. Torres is Hispanic and her native language is Spanish. Mrs.

5    Torres speaks very little English and is illiterate in English.

6        8.    Plaintiffs Heladio Arellanes and Maria Arellanes ("Mr. and Mrs. Arellanes") are

7    and at all relevant times were residents of Richmond, California. Mr. and Mrs. Arellanes are

8    Hispanic and their native language is Spanish. Mr. and Mrs. Arellanes speak very little English

9    and are illiterate in English.

10        9.    On behalf of themselves and all persons similarly situated, Plaintiffs bring this

11    class action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure.

12        10.    Defendant Ameriquest is a corporation organized under the laws of the State of

13    Delaware with its principal place of business in Orange, California. Ameriquest is a wholly

14    owned subsidiary of Ameriquest Capital Corporation.

15        11.    Defendant Argent is a Limited Liability Company organized under the laws of the

16    State of Delaware with its principal place of business in Orange, California. Argent is a wholly

17    owned subsidiary of Ameriquest Capital Corporation.

18        12.    Defendants Does 1 through 100, inclusive, are sued under fictitious names because

19    their true names and capacities are unknown to Plaintiffs, who will further amend this Complaint

20    when their true names and capacities are learned. Plaintiffs are informed and believe, and on that

21    basis allege, that each of the fictitiously-named Defendants is responsible in some manner for the

22    occurrences alleged herein, and that Plaintiffs' damages were caused by those Defendants.

23                    **JURISDICTION AND VENUE**

24        13.    This Court has personal jurisdiction over the Defendants named herein because a

25    substantial portion of the wrongdoing alleged in this Complaint took place in the Northern

26    District of California, Defendants' principal place of business is in California, and Defendants are

27    authorized to and regularly do business in the Northern District of California, including San

28    Mateo County.

COMPLAINT

1    14.    This is an action for violations of 15 U.S.C. § 1601 *et seq.* (Truth in Lending Act,

2    hereinafter "TILA"), 12 U.S.C. § 2601 *et seq.* (Real Estate Settlement Procedures Act, hereinafter

3    "RESPA"), 42 U.S.C. § 3601 *et seq.* (Fair Housing Act), 15 U.S.C. § 1691 *et seq.* (Equal Credit

4    Opportunity Act), and related state laws.  This Court has subject matter jurisdiction of this action

5    pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367 (supplemental jurisdiction).

6    15.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a

7    substantial portion of the events and omissions giving rise to this Complaint occurred within the

8    Northern District of California.  The loan contracts between Plaintiffs and Defendants were made

9    and to be performed, and the obligations arose, in the Northern District of California.

10                    **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

11    16.    This lawsuit is brought on behalf of a class consisting of all persons, wherever

12    located, who entered into loan or line of credit transactions with any named Defendant or their

13    predecessors, directly or indirectly, where such transaction involved any of the wrongful conduct

14    described herein ("Class" or "Class Members").  Excluded from the Class are Defendants, their

15    parents, subsidiaries and affiliates, officers and directors, or any entity in which Defendants have

16    a controlling interest, and the legal representatives, successors, or assigns of any such excluded

17    persons.

18    17.    Class Members are so numerous that joinder of all Class Members is

19    impracticable.  While the exact number of Class Members is unknown to Plaintiffs at this time,

20    such information can be ascertained through appropriate discovery from records maintained by

21    Defendants and their agents.  Plaintiffs are informed and believe that the number of potential

22    Class Members is in the hundreds or thousands.

23    18.    Plaintiffs' claims are typical of the claims of Class Members, as Plaintiffs and all

24    other Class Members suffered harm arising out of Defendants' wrongful conduct as alleged

25    herein.

26    19.    Defendants Ameriquest and Argent, though separate entities, are both wholly

27    owned subsidiaries of Ameriquest Capital Corporation and are engaging in nearly identical

28    wrongful conduct.

COMPLAINT

1    20.    Plaintiffs will fairly and adequately represent and protect the interests of the Class,

2  and have retained counsel competent and experienced in class action and complex civil litigation.

3    21.    Common questions of law and fact exist as to all Class Members and predominate

4  over any questions solely affecting individual Class Members. Among the questions of law and

5  fact common to the Class are:

6    a.    Whether Defendants or their agents engaged in a pattern of failing to

7  provide required TILA disclosures clearly and conspicuously, in writing and in a form that the

8  plaintiffs could keep;

9    b.    Whether Defendants or their agents engaged in a pattern of falsifying

10  income without applicants' knowledge or consent;

11    c.    Whether Defendants or their agents have and are engaged in a "bait and

12  switch" scheme whereby borrowers are promised a set of loan terms only to learn after entering

13  the transaction that they have received a different and far less beneficial set of loan terms;

14    d.    Whether Defendants' documents, statements, contracts, advertisements and

15  practices relating to the transactions between Class Members and Defendants were unfair,

16  deceptive, untrue, misleading or omitted material facts and disclosures;

17    e.    Whether Defendants discriminated against Class Members on the basis of

18  race, national origin, age and/or gender;

19    f.    Whether Defendants engaged in unfair and unlawful business practices;

20    g.    Whether the acts of Defendants alleged herein violated other applicable

21  laws;

22    h.    Whether injunctive relief prohibiting Defendants' unfair and unlawful

23  business practices should be issued;

24    i.    Whether declaratory relief giving Class Members the right to rescind their

25  mortgage loans should be issued; and

26    j.    Whether Plaintiffs and the Class have sustained damages and, if so, the

27  proper measure of damages.

28

COMPLAINT

22.    A class action is the appropriate form of action for the following reasons:

a.    It is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class Members is impracticable;

b.    Common questions of law and fact of the Class predominate over any questions that apply only to individual Class Members;

c.    Relief is sought to enjoin Defendants from engaging in the wrongful conduct, as alleged herein, and for declaratory relief providing all Class Members the right to rescind any loan contract with any Defendant; and

d.    Prosecution of individual actions may result in inconsistent judgments.

## THE NATURE OF SUBPRIME LENDING

23.    Subprime lending is the business of making loans to persons with low income or credit deficiencies. Subprime lending generally involves residential loans or equity lines of credit based upon equity in a residential property.

24.    Subprime borrowers generally are charged up-front fees of 3% to 4% and interest rates of 10% to 12%. By contrast, conventional borrowers with strong credit generally pay 1% or less in fees and obtain interest rates of approximately 7%.

25.    Borrowers with good credit usually earn an "A" credit rating, which qualifies them for the best loans on the most favorable terms. However, as competition for "A" rated borrowers has increased, profit margins for "A" lending has diminished. As a consequence, more "A" lenders began pursuing the subprime market to compensate for these lower profits. Subprime borrowers are often referred to as "B" or "C" or "non-conforming" borrowers.

26.    The greatest factor in the growth of the subprime market is the ever-increasing prevalence of debt. To the extent that lenders pursue subprime loans and put borrowers into high-cost loans they cannot afford, subprime lending may be riskier for the lender than most conventional lending. However, the potential payoffs to the lender more than make up for the risk, as the lender can profit handsomely from large up-front loan origination fees and hefty interest rates.

COMPLAINT

5

## PREDATORY LENDING PRACTICES DECEITFULLY AND
## UNFAIRLY TAKE ADVANTAGE OF CONSUMERS

27.    Predatory subprime lenders "flip" loans in order to artificially generate closing fees. By this practice, lenders encourage unnecessary and financially detrimental refinancing, as each time a loan is refinanced the borrower is again charged closing costs, which typically are rolled into the loan balance to be financed.

28.    Predatory subprime lenders knowingly make loans with high loan-to-value ratios. This skims the equity from the property, places the borrower in jeopardy of default, and puts the borrower in the position of spending years paying off additional loan balances without developing any equity.

29.    While some borrowers in the subprime market are genuine credit risks, many low-income, elderly and minority borrowers have been steered into subprime loans by lenders who are reluctant or refuse to offer them prime loans. Predatory lenders target such consumers for subprime loans. In this fashion, predatory lenders obtain more money by charging higher rates and fees than necessary or appropriate simply by inducing the borrowers to enter into a subprime rather than prime loan transaction. Studies by Freddie Mac and Standard & Poor's have found that 20% to 30% of borrowers who receive subprime mortgages could have qualified for traditional mortgages at the lower rates offered by banks to prime borrowers. Thus, subprime lenders make loans and offer equity lines on residences to borrowers with "A" credit ratings, but charge the borrowers interest rates of "B" credit consumers. The practice of targeting communities with a primarily low-income, elderly, or racial/ethnic minority population for imposition of unjustifiably expensive loan terms is known as "reverse redlining."

30.    Subprime lending has grown rapidly in recent years. According to HUD, subprime loans for home purchases increased by 56.3% from 1993 to 1998, in a period of economic growth and extremely low unemployment, compared to an increase of only 16.4% for conventional products. Annual growth since 1993 has exceeded 40% in total subprime loan originations.

31.    Predatory subprime lenders often charge interest rates unrelated to credit risk and

COMPLAINT

1    charge or impose large, up-front loan fees and costs.

2    **DEFENDANTS' ROLE AS PREDATORY LENDERS**

3    32.    Defendants have engaged in a scheme of targeting elderly, female, minority and/or

4    low-income individuals to deceitfully and wrongfully induce them to enter into loan contracts

5    with Defendants.  Furthermore, Defendants have ignored and/or circumvented statutory and

6    industry safeguards intended to protect the financially unsophisticated borrowers that Defendants

7    target.

8    33.    Ameriquest is the nation's largest retail lender to borrowers with poor credit

9    histories or low incomes.  Ameriquest targets persons in low-income neighborhoods for soliciting

10    high-priced mortgages.

11    34.    In 1996, Ameriquest, then known as Long Beach Mortgage Company ("LBMC"),

12    entered into a $4 million settlement with the U.S. Department of Justice ("DOJ") arising from

13    charges that it engaged in discriminatory pricing practices.  A true and correct copy of the

14    complaint and settlement agreement are attached as **Exhibits A and B**, respectively.  The DOJ's

15    charges included allegations that LBMC charged fees and interest rates on loans to older African-

16    American female borrowers that were four times higher than the fees and interest rates charged to

17    younger male borrowers of other races.

18    35.    In April 1997, less than one year after entering into the settlement agreement with

19    the DOJ, LBMC changed its name to Ameriquest Mortgage Company.  A true and correct copy

20    of LBMC's amended articles of incorporation is attached as **Exhibit C**.  Around the same time,

21    Long Beach Financial Services ("LBFS"), LBMC's parent company, changed its name to

22    Ameriquest Capital Corporation.  A true and correct copy of LBFS's amended articles of

23    incorporation is attached as **Exhibit D**.

24    36.    Defendants aggressively solicit low-income borrowers to enter into refinancing

25    and other residential real estate transactions involving principal amounts that exceed the

26    borrowers' ability to repay.  Thus, at the outset of these transactions, Defendants anticipate that

27    the transactions may well lead to default and foreclosure.  Defendants remain unconcerned,

28    however, because they obtain exorbitant fees up-front and unconscionable interest rates in the

COMPLAINT

7

1    interim, making the transactions much more profitable than conventional mortgages.

2    37.    Defendants unfairly and unlawfully obtain origination fees, excessive interest

3    payments, and prepayment penalties by extending loans to consumers, including Plaintiffs and

4    Class Members, for which they do not qualify and cannot afford.  Defendants achieve this

5    unlawful result by falsifying the income of Plaintiffs and Class Members stated on mortgage

6    applications, without the applicants' knowledge or consent.

7    38.    In addition, Defendants offer consumers who are female, elderly and/or of

8    minority race or national origin loans with substantially less favorable terms than those offered by

9    Defendants to males, non-seniors and persons of other races.

10    39.    Defendants deceive and otherwise harm unsuspecting consumers by inducing them

11    to enter into inappropriate loans and line of credit transactions that saddle them with principal

12    obligations that are unlikely to be able to be repaid when compared to the consumers' monthly

13    income and ability to pay.

14    40.    At the heart of this scheme are Defendants' persistent "bait and switch" tactics.

15    Defendants induce customers to agree to enter into loan transactions by promises of "no costs" up

16    front, fixed interest rates, all-inclusive low monthly payments and/or particular fees and interest

17    rates.  When the paperwork is presented to the customers for signature, however, the terms are

18    different from those promised, with huge up-front costs, variable interest rates instead of fixed

19    rates, monthly payments that do not include taxes and insurance, and/or higher fees or interest

20    rates than previously represented.  By these and other unlawful tactics, including falsifying

21    borrowers' income without their knowledge or consent, Defendants qualify the borrowers for

22    loans that they would not otherwise be able to obtain and induce the borrowers to go forward with

23    the transactions.  At the time of the transactions, however, the borrowers frequently are unaware

24    that the terms of the mortgage contract do not match Defendants' prior representations.

25    Furthermore, Defendants or their agents mislead the borrowers by misrepresenting the contents of

26    documents and telling the borrowers there is no need or time to read them—just "sign here."

27    41.    In furtherance of the "bait and switch" scheme, Defendants failed to provide

28    required disclosures to Plaintiffs and Class Members and misled them as to the true terms and

COMPLAINT

8

1   costs of their loan transactions.  Defendants instructed Plaintiffs and Class Members to sign as

2   indicated on the mortgage applications and contracts, without providing them an opportunity to

3   review the papers, and while misrepresenting their contents as alleged above.  Additionally, in the

4   case of Plaintiffs and Class Members that are illiterate in English, Defendants failed to inform or

5   provide translations of the contents of the mortgage applications and contracts.

6           42.     Defendants' marketing and sales schemes have been implemented through, among

7   other means, standardized training, conditioning and oral scripts, uniform written materials

8   disseminated to targeted homeowners, and uniform business contracts and forms.  Defendants

9   have developed and implemented a misleading sales approach or "sales pitch" used by

10  Defendants' agents and employees when soliciting potential or existing borrowers.

11          43.     These oral misrepresentations were in conformity with standardized letters,

12  brochures, and other advertisements developed and were used by Defendants to induce consumers

13  to enter subprime loan transactions.

14          44.     As part and parcel of their common course of conduct, Defendants' business

15  practices include oppressive and harassing marketing techniques.  Defendants use these high-

16  pressure tactics to induce consumers to enter into residential loan transactions.  Defendants

17  especially target past customers to enter into new loans and existing customers to increase their

18  loans by "rolling in" other debts.  With respect to existing customers, Defendants "flip" the

19  existing loans into new loans, adding to the principal amounts due, and tacking on additional high

20  loan generation fees (for instant profit to Defendants).

21          45.     As part of their corporate marketing plan and wrongful scheme, Defendants

22  intentionally and particularly targeted homeowners who are senior citizens, racial minorities,

23  widows, persons with low income, and/or residents of geographic areas known to be underserved

24  by conventional lenders, including without limitation the City of East Palo Alto in San Mateo

25  County, California.  These consumers are bombarded by mailers, telephone calls and personal

26  visits by Defendants' sales personnel inviting them to "consolidate their debts" or obtain money

27  for remodeling through residential equity loans and refinancing transactions, all under the

28  misleading pretext that such loans are at truly "no cost" and will enable consumers to reduce their

COMPLAINT

1   monthly payments. The true purpose of these transactions is for Defendants to obtain huge up-

2   front fees and impose high interest rates. Borrowers' rarely derive any benefit from the refinance

3   and monthly payments are often increased, rather than reduced, as a result of transacting with

4   Defendants.

5        46.    In connection with their "bait and switch" scheme, Defendants also have engaged

6   in false and misleading advertising and other marketing to induce consumers to enter into

7   residential real estate loan transactions that were financially detrimental to those consumers and

8   known by Defendants to be unconscionable, especially when compared to the risks involved and

9   the income of the borrowers.

10        47.    These marketing and advertising materials falsely emphasize that the loans will be

11   tailored to meet the needs of the borrower at reasonable rates and without obligation.

12   Defendants' marketing and advertising materials specifically target low-income and financially

13   troubled individuals. For example, one of Defendants' brochures published and disseminated in

14   California provides in pertinent part:

15

16   YOU DESERVE RESPECT

17       It's a whole new approach to lending. We realize that, as a homeowner,
you have proven yourself to be a responsible, hard-working individual. And that
is a significant factor in our loan approval process. In fact, we don't require the
strict lending guidelines of most banks. And we don't charge the high rates that
many finance companies charge. We look beyond the numbers and credit
reports. We look at you - the person who worked hard enough to buy a home.
Our flexible lending guidelines let us work with most credit situations. We can
help even if you've experienced bankruptcy, credit problems, high debt ratios,
mortgage rates, defaults and liens, or if you're self-employed with a hard-to-
prove income.

18   YOU DESERVE THE PERFECT LOAN

19       With the equity you built up, you've already passed the first step in our
easy loan approval process. Whether you're buying a new home or refinancing
your current one, we can customize a loan to fit whatever your needs or special
situation may be. With our competitive rates and flexible payments, you can
maximize your budget. You can even pull out extra cash to consolidate your
high-interest credit cards and debt, and ultimately, lower your monthly payments.
Or you can use that extra money to make home improvements, pay school tuition,
buy a new car or take that well-deserved vacation. Whatever you want....

COMPLAINT

48.    As herein alleged, the representations contained in this advertisement and other similar advertisements disseminated by Defendants were and are materially false and misleading.

49.    Further, Plaintiffs are informed and believe, and on that basis allege, that Defendants' conduct, as herein alleged, is part of a pattern and practice of predatory lending that discriminates against low-income borrowers on the basis of race, national origin, age and/or gender.

**DEFENDANTS' CONDUCT TOWARD THE NAMED PLAINTIFFS**

**TYPIFIES DEFENDANTS' WRONGFUL CONDUCT**

**I.    Plaintiff Nona Knox**

50.    Plaintiff Nona Knox ("Mrs. Knox") is an elderly woman who owns and resides in a house in East Palo Alto. At the time of the events described herein, she was caring for her elderly husband, Albert Knox ("Mr. Knox"), who was suffering from cancer. Mr. Knox passed away in September 2004. Mrs. Knox maintains this action on her own behalf and on the behalf of her husband's estate.

51.    In early 2002, Mrs. Knox responded by telephone to an unsolicited advertisement mailed to her by Ameriquest. While the mailing was in fact a simple solicitation, it was designed by Ameriquest to appear to be a ready-to-execute contract. Ameriquest made an appointment with Mrs. Knox and sent two men, Richard Valle ("Valle") and another Ameriquest agent, to the Knox home. Mrs. Knox informed Valle that she and her husband wanted to refinance their home to pay off credit cards and a car loan and to obtain money to remodel their bathroom.

52.    Mrs. Knox showed Valle their then current mortgage terms and said that she wanted to refinance at a fixed rate. To the best recollection of Mrs. Knox, Valle responded, "We can do better," and asked Mrs. Knox and her husband their ages. Mrs. Knox was 66 at the time; Mr. Knox was 79.

53.    Valle filled out the entire loan application for Mrs. Knox. He did not have Mr. or Mrs. Knox write down any information. Rather, in response to Valle's questions about the Knoxes' income and assets, Mrs. Knox provided Valle with bank statements, social security check stubs, and pension information, which together documented a monthly income of

COMPLAINT

11

1    approximately $4,000.  The loan application, however, lists the Knoxes' monthly income as

2    $6,800.  This false amount was inserted into the mortgage application without the knowledge or

3    consent of Mr. or Mrs. Knox.

4          54.    Valle also told Mrs. Knox that the loan would be at "no cost" to them, and he

5    promised that they would receive $20,000 cash back for the bathroom remodel.

6          55.    Mrs. Knox asked Valle whether he was offering the best rate.  To Mrs. Knox's

7    best recollection, Valle responded, "I'm giving you the lowest possible rate for a person your

8    age."

9          56.    Valle and the other Ameriquest agent returned to the Knox home on May 13,

10   2002, to complete the signing of the mortgage contract.  The contract was dated May 10, 2002.

11   The loan signing took only about one hour, during which Valle did most of the talking.  Valle did

12   not give Mrs. Knox an opportunity to read even a single page of the loan contract; instead, he

13   flipped through the contract page by page while substantially stating, "this is for [purported

14   purpose of the page], sign here."  When Mrs. Knox inquired why she and her husband needed to

15   sign blank pages, Valle responded, to the best of Mrs. Knox's recollection, "You just need to sign

16   these to get things done."

17         57.    At the May 13 signing, the loan contract presented to Mr. And Mrs. Knox by Valle

18   and the other Ameriquest agent included a Notice of Right to Cancel dated May 10, 2002.  This

19   notice was ineffective, however, since Defendants failed to fill in both the "signing date" and the

20   "final date to cancel."  Furthermore, even had this information been included, the notice still

21   would have been ineffective since Valle did not leave any copies of the notice with the Knoxes.

22         58.    A notary brought to the Knox home by Valle and the other Ameriquest agent took

23   Mr. and Mrs. Knox's fingerprints, checked their identification, and signed and stamped the notary

24   book.  A notary stamp does not appear, however, anywhere on the purported copy of the loan

25   contract later provided to the Knoxes.

26         59.    Valle did not leave a copy of the loan contract or any other papers with Mrs. Knox,

27   nor did he say anything to her about points, fees, or the insufficiency of income.

28         60.    Valle did not tell Mr. or Mrs. Knox that the loan contract—which was based on the

COMPLAINT

1  loan application filled out by Valle—falsely stated that the Knoxes' monthly income was $6,800

2  and that Mr. Knox was self-employed by the "Knox Music Academy," a fictitious entity

3  purportedly operating at the Knox home address. Mr. and Mrs. Knox did not know that this

4  fictitious income from a fictitious business was included in the loan contract and did not suggest

5  or consent to it. Mr. Knox was not a music teacher of any kind. Indeed, at the time of the loan

6  application and contract signing, Mr. Knox was suffering from terminal cancer and related

7  medical conditions, and was unable to tend to rudimentary daily activities without the assistance

8  of Mrs. Knox.

9      61.    Ameriquest did not provide Mr. or Mrs. Knox with possession of the loan

10  documents until after the loan had been approved, at which time Valle returned to the Knox home

11  with a disbursement check. The check was for only approximately $8,000, even though Valle

12  had promised the Knoxes that they would receive approximately $20,000 in cash. According to

13  Valle, the discrepancy was due to Mr. and Mrs. Knox needing to pay off more bills.

14      62.    Unbeknownst to Mr. and Mrs. Knox, the loan was "bought down" from 12.5% to

15  8.252% fixed APR at a cost of $14,875, which was added to the loan principal without the

16  knowledge or consent of Mr. or Mrs. Knox. The Knoxes also paid $2,726 in closing costs and

17  $1,114.80 for the first month's interest. The Knoxes' total settlement charges were $18,715.80,

18  despite having been told that the loan would be at "no cost" to them.

19  **II.    Plaintiff Maria Torres**

20      63.    Plaintiff Maria Torres ("Mrs. Torres") received an unsolicited phone call from an

21  Ameriquest agent, Jesús Elizalde ("Elizalde"), urging her to refinance her then current mortgage.

22  Mrs. Torres was not prepared to commit, and while she remained undecided Elizalde repeatedly

23  called her to urge her to refinance.

24      64.    After Elizalde convinced her to refinance, Mrs. Torres traveled to his office to

25  provide information. During this meeting all discussions regarding the loan took place in

26  Spanish, as Mrs. Torres speaks no English.

27      65.    During the first meeting, Elizalde had Mrs. Torres sign various papers. He did not

28  inform Mrs. Torres about the contents of the papers or their purpose. Mrs. Torres did not read or

COMPLAINT

13

1  fill out any paperwork, nor could she, as she is illiterate in English. Mrs. Torres informed

2  Elizalde that her monthly income was approximately $1,700 and that she occasionally received

3  approximately $500 in gifts from her children. Mrs. Torres provided pay stubs from her janitorial

4  job and other basic information to Elizalde. The loan application, however, lists Mrs. Torres'

5  monthly income as $4,500—an amount inserted into the mortgage application without Mrs.

6  Torres' knowledge or consent. No information was provided regarding Mrs. Torres' husband or

7  his income.

8        66.    Approximately one month later, Elizalde told Mrs. Torres to come back to his

9  office to complete the transaction. Mrs. Torres returned to Elizalde's office. Elizalde requested

10  that Mrs Torres sign various documents; she signed where Elizalde indicated, but could not read

11  the documents to confirm their contents because all were in English. Elizalde did not inform Mrs.

12  Torres of the contents of the documents. Elizalde never told Mrs. Torres whether the interest rate

13  was fixed or variable, that there were prepayment penalties and broker fees, or that her income

14  had been falsified.

15        67.    The loan contract presented to Mrs. Torres for signature included a Notice of Right

16  to Cancel. This notice was ineffective, however, since Defendants failed to fill in both the

17  "signing date" and the "final date to cancel." Furthermore, even had this information been

18  included, the notice still would have been ineffective since the document was in English. Finally,

19  even had Defendants presented a Spanish-translation copy to Mrs. Torres at the signing, the

20  notice still would have been ineffective because Defendants did not leave such a copy with Mrs.

21  Torres.

22  **III.    Plaintiffs Heladio Arellanes and Maria Arellanes**

23        68.    Plaintiffs Heladio Arellanes and Maria Arellanes ("Mr. and Mrs. Arellanes") were

24  referred to Argent's agent, Rogelio Mota ("Mota"), by a neighbor. All meetings and

25  conversations took place in Spanish, as Mr. and Mrs. Arellanes do not speak English.

26        69.    Mr. and Mrs. Arellanes went to Mota's office and informed him that they were

27  interested in refinancing their then current mortgage because they had a high interest rate. Mr.

28  and Mrs. Arellanes specifically requested a loan with a lower interest rate, and one that included

COMPLAINT

1   taxes and insurance. This first meeting lasted only fifteen minutes. Mr. and Mrs. Arellanes gave

2   Mota copies of their then current mortgage papers, pay stubs and bank statements. Mr. and Mrs.

3   Arellanes did not fill out or sign any paperwork.

4         70.    Mota contacted Mr. and Mrs. Arellanes approximately thirty days later and

5   informed them that the loan had been approved. He asked them to come by his office to sign the

6   forms. The loan application falsely lists Mr. and Mrs. Arellanes' monthly income as $4,761.49.

7   Neither Mr. nor Mrs. Arellanes had knowledge of this misstatement of income nor suggested or

8   consented to it.

9         71.    During the second meeting at Mota's office, Mota told Mr. and Mrs. Arellanes

10  where to sign the documents, without providing any translation or information regarding their

11  contents. The documents were entirely in English. Mr. and Mrs. Arellanes did not read the

12  documents, as they are illiterate in English. Mota's only explanation regarding the documents

13  was to promise Mr. and Mrs. Arellanes that their monthly payments would be lower.

14        72.    Specifically, Mota never informed Mr. and Mrs. Arellanes, *inter alia*, that the

15  interest rate on the new loan was variable as opposed to fixed; that there was a prepayment

16  penalty; that their income had been falsified; or that they had a right to rescind or cancel the

17  contract before a certain date. Mota gave Mr. and Mrs. Arellanes an unsigned copy of the

18  documents, but only in English.

19        73.    The loan contract presented to Mr. and Mrs. Arellanes for signature included a

20  Notice of Right to Cancel. This notice was ineffective, however, since Defendants failed to fill in

21  both the "signing date" and the "final date to cancel." Furthermore, even had this information

22  been included, the notice still would have been ineffective since the document was in English.

23  Finally, even had Defendants presented a Spanish-translation copy to Mr. and Mrs. Arellanes at

24  the signing, the notice still would have been ineffective because Defendants did not leave such a

25  copy with them.

26  / /

27  / /

28  / /

COMPLAINT

15

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### Violation of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* and Federal Reserve Regulation Z, 12 C.F.R. § 226.1 *et seq.*
### (Against All Defendants)

74.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 73, inclusive, as if fully set forth herein.

75.    Defendants Ameriquest and Argent are creditors within the meaning of the Truth in Lending Act as implemented by Regulation Z.

76.    Ameriquest violated TILA and Regulation Z by:

a.    Failing to provide Plaintiffs and Class Members with material disclosures in a form they could keep prior to consummation, in violation of 12 C.F.R. § 226.17;

b.    Failing to provide Plaintiffs and Class Members with notices of right to cancel that were clear, conspicuous, and reflective of the parties' legal obligations, in violation of 12 C.F.R. § 226.23;

c.    Failing to take into account the ability of Plaintiffs and Class Members to repay their loans, in violation of 15 U.S.C. § 1639(h); and

d.    Subjecting the loans to a prepayment penalty, in violation of 15 U.S.C. § 1639(c).

77.    Plaintiffs and Class Members were and continue to be, as a direct and proximate result of these violations, damaged in a sum according to proof, not yet ascertained, including, but not limited to, statutory damages and all amounts paid or to be paid to Defendants, excluding principal payments.

WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

//
//
//
//
//

COMPLAINT

16

**SECOND CAUSE OF ACTION**
**Violation of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.***
**and Regulation X, 24 C.F.R. § 3500.1 *et seq.***
**(Against All Defendants)**

78.   Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 77, inclusive, as if fully set forth herein.

79.   The loan agreements between Plaintiffs and Class Members, on the one hand, and Defendants, on the other hand, are federally related mortgage loans as defined by the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602.

80.   Defendants violated RESPA by failing to provide the disclosures required by RESPA in an accurate and timely fashion.

81.   Plaintiffs and Class Members were and continue to be, as a direct and proximate result of these violations, damaged in a sum according to proof, not yet ascertained, including, but not limited to, all amounts paid or to be paid to Defendants, excluding principal payments.

WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

**THIRD CAUSE OF ACTION**
**Violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.***
**(Against All Defendants)**

82.   Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 81, inclusive, as if fully set forth herein.

83.   Defendants Ameriquest and Argent are entities that engage in transactions related to residential real estate, and the loans made by Defendants to Plaintiffs and Class Members, as alleged herein, were such transactions.

84.   Plaintiffs and Class Members are minorities.

85.   Plaintiffs are informed and believe, and on that basis allege, that Defendants discriminated against them and Class Members, on the basis of their race and/or gender, in the terms and conditions of the loan contracts entered into between Plaintiffs and Class Members, on the one hand, and Defendants, on the other.

86.   Plaintiffs and Class Members have been damaged as a result of Defendants'

COMPLAINT
17

1    discriminatory conduct.

2         WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

3

4                                **FOURTH CAUSE OF ACTION**
                **Violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.***
5                                    **(Against All Defendants)**

6         87.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through

7    86, inclusive, as if fully set forth herein.

8         88.    Defendants Ameriquest and Argent are creditors within the meaning of 15 U.S.C.

9    § 1691(e).

10        89.    The loan contracts that Plaintiffs and Class Members entered into with Defendants

11   were credit transactions.

12        90.    Plaintiffs are informed and believe, and on that basis allege, that Defendants

13   discriminated against them and Class Members, on the basis of race, national origin and/or

14   gender, in the terms and conditions of the loan contracts entered into between Plaintiffs and Class

15   Members, on the one hand, and Defendants, on the other.

16        91.    Plaintiffs and Class Members have been damaged as a result of Defendants'

17   discriminatory conduct.

18        WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

19

20                                **FIFTH CAUSE OF ACTION**
                        **Violation of the Unruh Act, California Civil Code § 51**
21                                    **(Against All Defendants)**

22        92.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through

23   91, inclusive, as if fully set forth herein.

24        93.    Plaintiffs are informed and believe, and on that basis allege, that Defendants

25   discriminated against them and Class Members, on the basis of race, national origin, and/or

26   gender, in the terms and conditions of the loan contracts entered into between Plaintiffs and Class

27   Members, on the one hand, and Defendants, on the other.  Specifically, the terms and conditions

28   offered to Plaintiffs and Class Members were less favorable than those offered by Defendants to

COMPLAINT



1    borrowers not better qualified than Plaintiffs and Class Members but of different race, national

2    origin and/or gender.

3        94.    Plaintiffs and Class Members have been damaged as a result of Defendants'

4    discriminatory conduct.

5        WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

6

7                                    **SIXTH CAUSE OF ACTION**
                    **Violation of California Business and Professions Code § 17200 *et seq.***
                                    **(Against All Defendants)**

8

9        95.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through

10   94, inclusive, as if fully set forth herein.

11       96.    Plaintiffs and Class Members are informed and believe, and on that basis allege,

12   that Defendants, and each of them, engaged in numerous acts and/or practices of unfair

13   competition within the state of California in violation of Business and Professions Code section

14   17200 *et seq.* and similar sister-state statutes proscribing deceptive business practices.  These acts

15   or practices include without limitation the following:

16           a.    Offering and making Plaintiffs and Class Members loans, while failing to

17   take into account their ability to repay such loans;

18           b.    Misrepresenting to Plaintiffs and Class Members the terms on which

19   Defendants were willing to enter into refinancing or other loan transactions with them;

20           c.    Failing to provide required notices and copies of loan documents;

21           d.    Falsifying information in loan applications of Plaintiffs and Class

22   Members, without their knowledge or consent;

23           e    Discriminating on the basis of race, national origin, gender and/or age; and

24           f.    Violating the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*; the Real

25   Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.*; the Fair Housing Act, 42 U.S.C.

26   § 3601 *et seq.*; the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*; California Business

27   and Professions Code section 17500 *et seq.*; the Consumers Legal Remedies Act, California Civil

28   Code section 1750 *et seq.*; or any other applicable statute.

COMPLAINT

97.     The above-described unlawful, unfair and fraudulent business practices present an ongoing threat of injury to Plaintiffs, Class Members and the general public. Plaintiffs, Class Members and the general public continue to be financially harmed by such conduct and, unless it is restrained, Defendants, and each of them, will continue to engage in such conduct.

98.     Pursuant to California Business and Professions Code section 17203 and similar state statutes, Plaintiffs and Class Members are entitled to an order of this Court enjoining Defendants, and each of them, from continuing to engage in unfair competition as defined in Business and Professions Code section 17200 in the State of California and similar statutes of sister-states. Plaintiffs, Class Members, and the general public will be irreparably harmed if such an order is not granted.

99.     Plaintiffs and Class Members have been injured by Defendants' conduct and are entitled to restitution and disgorgement of profits realized by Defendants, and each of them, as a result of their unfair competition as defined in Business and Professions Code section 17200 *et seq.* and similar sister-state statutes.

WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

**SEVENTH CAUSE OF ACTION**
**Violation of California Business and Professions Code § 17500 *et seq.***
**(Against All Defendants)**

100.     Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 99, inclusive, as if fully set forth herein.

101.     The advertising, promotional materials and other written and oral promotional efforts undertaken by Defendants to induce consumers to enter into loan transactions with Defendants contained statements that were deceptive, untrue and/or misleading, or omitted material information, and which were known, or by the exercise of reasonable care should have been known, by Defendants, and each of them, to be deceptive, untrue and/or misleading, in violation of California Business and Professions Code section 17500 *et seq.* and similar sister-state statutes proscribing false advertising.

102.     Defendants' use of various forms of advertising media to advertise, call attention

COMPLAINT



1   to or give publicity to the sale of their goods and services, and other practices, as set forth above,

2   which were not as advertised or as otherwise represented, constituted unfair competition;

3   deceptive, untrue and/or misleading advertising; and unlawful business practice within the

4   meaning of California Business and Professions Code sections 17200 *et seq.* and 17500 *et seq.*

5   These advertisements and practices have deceived and are likely to deceive the consuming public

6   in violation of those sections.

7        103.    Pursuant to California Business and Professions Code sections 17203 and 17535,

8   Plaintiffs and Class Members, individually and on behalf of the public, seek an order of this Court

9   enjoining Defendants, and each of them, from continuing to engage in their false advertising

10  practices.  The public, Plaintiffs and Class Members will be irreparably harmed if such an order is

11  not granted.

12       104.    Plaintiffs and Class Members have been injured by Defendants' conduct and are

13  entitled to restitution and disgorgement, individually and on behalf of the public, of profits

14  realized by Defendants, and each of them, as a result of their unfair, unlawful, deceptive, untrue

15  and/or misleading advertising practices.

16       WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

17

18                    **EIGTH CAUSE OF ACTION**
             **Violation of California Civil Code § 1750 *et seq.***
                       **(Against All Defendants)**

19

20       105.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through

21  104, inclusive, as if fully set forth herein.

22       106.    By their wrongful conduct as alleged herein, Defendants created, engaged in

23  and/or participated in unfair acts or practices in violation of the Consumers Legal Remedies Act,

24  California Civil Code section 1750 *et seq.*, and similar sister-state statutes.

25       107.    By their conduct, Defendants engaged in unfair or deceptive acts or practices in

26  transactions intended to result in the sale of goods or services in violation of California Civil

27  Code section 1770, including but not limited to:

28

COMPLAINT
                                                    21

1          a.      Representing that their goods or services have characteristics, uses, or

2   benefits which they do not have, in violation of section 1770(a)(5);

3          b.      Advertising goods or services with intent not to sell them as advertised, in

4   violation of section 1770(a)(9); and/or

5          c.      Representing that the subject of a transaction has been supplied in

6   accordance with a previous representation when it has not, in violation of section 1770(a)(16).

7          108.    Plaintiffs and Class Members have as a direct and proximate result of Defendants'

8   unfair or deceptive acts or practices suffered and continue to suffer damages in a sum according

9   to proof, not yet ascertained, including, but not limited to, all amounts paid or to be paid to

10  Defendants by Plaintiffs and Class Members, excluding principal payments.

11         109.    Pursuant to section 1780, Plaintiffs and Class Members seek to enjoin Defendants,

12  and each of them, from engaging in their unfair methods of competition or unfair or deceptive

13  acts or practices, as alleged herein.

14         WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

15
16                          **NINTH CAUSE OF ACTION**
                            **Unjust Enrichment**
17                          **(Against All Defendants)**

18         110.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through

19  109, inclusive, as if fully set forth herein.

20         111.    By their wrongful acts and omissions, Defendants were unjustly enriched at the

21  expense of Plaintiffs and Class Members.

22         112.    Plaintiffs and Class Members are entitled to restitution from Defendants and

23  disgorgement of all profits, benefits and other compensation obtained by Defendants through their

24  wrongful conduct.

25         WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

26  / /

27  / /

28  / /

COMPLAINT
                                                22

1

**PRAYER FOR RELIEF**

2  1.   Certification of a plaintiff class;

3  2.   Compensatory and general damages according to proof;

4  3.   Special damages according to proof;

5  4.   Restitution and disgorgement according to proof;

6  5.   Declaratory relief;

7  6.   Injunctive relief;

8  7.   Prejudgment interest at the maximum legal rate;

9  8.   Punitive and exemplary damages according to proof;

10  9.   Costs of the proceedings herein;

11  10.  Reasonable attorneys' fees; and

12  11.  All such other and further relief as the Court deems proper.

13

14  Dated: January 13, 2005

FENWICK & WEST LLP

15

16  By: _____

Aaron Myers

17

18  Attorneys for Plaintiffs
NONA KNOX, ALBERT KNOX, MARIA

19  TORRES, HELADIO ARELLANES AND
MARIA ARELLANES

20

21

22

23

24

25

26

27

28

COMPLAINT

23

1

### DEMAND FOR JURY TRIAL

2        Pursuant to Federal Rule of Civil Procedure 38(b) and Local Rule 30-6, Plaintiffs hereby

3    demand a trial by jury.

4

5    Dated:  January 13, 2005                          FENWICK & WEST LLP

6

7                                                      By: _____
                                                           Aaron Myers
8
                                                      Attorneys for Plaintiffs
9                                                     NONA KNOX, ALBERT KNOX, MARIA
                                                      TORRES, HELADIO ARELLANES AND
10                                                    MARIA ARELLANES

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                                                    B9042/00448/LIT/1219198

28

COMPLAINT

24

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,
    Plaintiff,

v.

                                          Case No. CV-96-6159

LONG BEACH MORTGAGE COMPANY,
    Defendant.

_____

### COMPLAINT FOR COMPENSATORY AND PUNITIVE DAMAGES,
### CIVIL MONEY PENALTIES AND INJUNCTIVE RELIEF

The United States alleges that Defendant Long Beach Mortgage Company has engaged in a pattern or practice of illegal discrimination by basing the price of loans, at least in part, on an applicant's race, national origin, sex and/or age.

Specifically, the United States alleges:

### I. JURISDICTION AND VENUE

1. This action is brought by the United States to enforce the provisions of Title VIII of the Civil Rights Act of 1968 ("Fair Housing Act"), as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601-3619, and of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691-1691f.

2. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1345, 42 U.S.C. § 3614, and 15 U.S.C. § 1691(h) and venue is appropriate pursuant to 28 U.S.C. §§ 1391(c), 1392(a) and 1395. For purposes of venue, Defendant Long Beach Mortgage company resides in Los Angeles County within the meaning of 28 U.S.C. 1391(c), Local Rule 4.1 and General Order 349-A (January 30, 1995), because it operates eleven retail offices in Los Angeles County. Moreover, a majority of the aggrieved persons in this case reside in Los Angeles County.

### II. THE DEFENDANT

3. Defendant Long Beach Mortgage Company is incorporated under the laws of the State of Delaware. In subsequent paragraphs of this complaint, Long Beach Mortgage Company will be referred to as "Long Beach," "the lender" or "the defendant."

4. Between December 1990 and October 1994, Long Beach Mortgage Company operated under the name of Long Beach Bank, as a federally chartered thrift institution, and was subject to the regulatory authority of the Office of Thrift Supervision ("OTS"). Prior to December 1990, Long Beach Bank was a savings and loan association, chartered by the State of California. With respect to the allegations of this Complaint, the lender's operations were essentially the same before and after its status changes.

5.  Long Beach's business includes engaging in residential real estate-related transactions and regularly extending credit to persons. Long Beach, as an entity whose business includes engaging in residential real estate transactions -- including home equity lending as well as home purchase and refinancing lending -- is subject to the requirements of the Fair Housing Act, as amended, 42 U.S.C. §§ 3601-3619. Long Beach is also a creditor as that term is defined by section 702(e) of the ECOA, 15 U.S.C. § 1692a(e), and is, therefore, subject to the requirements of the ECOA and its implementing Regulation B, as amended, 12 C.F.R. Part 202, in effect on or after March 23, 1977.

6.  According to data Long Beach has reported under the Home Mortgage Disclosure Act, for the years 1990 through 1993, almost all of its residential mortgages were made in California. In 1994, about 82% were made in California, reflecting the lender's recent expansion into other states.

7.  In the spring of 1993 the OTS conducted an examination of the lending practices of Long Beach to evaluate its compliance with, among other laws, the Fair Housing Act and the Equal Credit Opportunity Act. Based on information gathered in its examination, OTS determined that there was reason to believe that Long Beach may have engaged in a pattern or practice of discrimination on the basis of race and national origin in the loan prices charged to borrowers for residential mortgage loans. On January 5, 1994, OTS referred this matter to the United States Department of Justice pursuant to the referral provisions of the ECOA, 15 U.S.C. § 169le(g).

8.  The United States' allegations of discrimination are based on its investigation of Long Beach Bank's practices from January 1991 through June 1994 ("the period in question").

## III.  BACKGROUND

### A.  The "B/C" Mortgage Market

9.  Long Beach has targeted its mortgage lending activities toward a segment of the residential lending market known as the "B/C" or subprime market. This market is comprised of depository institutions, mortgage companies and finance companies that serve borrowers who, because of their higher credit risk or perceived higher credit risk, do not secure home mortgage loans from what is known as the "A" or prime market. Long Beach, like other "B/C" lenders, prices its loans according to the level of risk suggested by the qualifications of the borrowers so that the price of the loan increases as the qualifications of the borrowers weaken.

10. As a condition of its willingness to approve home mortgage loan applications of borrowers who may not meet the "A" mortgage market underwriting guidelines, Long Beach charges its borrowers prices that are substantially higher than those that are prevalent in the "A" market. The higher prices take the form of higher interest rates, higher fees and/or a greater number of discount "points" (each point being one percent of the loan amount, paid at the time of loan closing).

11. Loans made in the "B/C" market rarely last for the duration of the amortization period set forth in the loan contract. Between 1991 and 1994, loans in the "B/C" market in general, and loans funded by Long Beach in California in particular, were re-financed, or otherwise turned over, on an average of less than four years despite contractual amortization periods of fifteen or thirty years. Long Beach was aware of and predicted this relatively quick turnover of its loan portfolio, and relied upon its estimates of the turnover rate to package and market its loans to secondary market purchasers.



## B. **Mortgage Lending operations**

12. Long Beach develops and implements its home lending business through employees and through mortgage brokers. The business developed by employees is known as "retail" lending and the business developed by brokers is known as "wholesale" lending. In all of its lending activities, including wholesale and retail, Long Beach reserves the right to determine whether applicants are qualified for financing and to set the terms and conditions of any financing to be granted. All loans are funded by, and in the name of, Long Beach.

13. In addition to allowing employees and brokers to propose a risk level for each applicant, Long Beach has permitted employees and brokers to propose a loan price that exceeds the lender's base price for the stated risk level. The portion of the proposed price above the base price for the risk level is unrelated to the qualifications of the borrowers or the risk to the lender. Rather, this portion of the proposed price determines, or assists in determining, the compensation to be paid to the employee or broker.

14. The fees and points paid to Long Beach and to the brokers were financed in most instances from the proceeds of the loan funded by Long Beach.

15. During the period in question, Long Beach placed ceilings on the amount by which the price proposed by employees or brokers could exceed the lender's base price, but these caps allowed for great variation in the pricing of loans. For example, brokers were permitted to charge as many as 12 points above the lender's base price. Thus, for a loan in the amount of $100,000, the lender permitted an additional charge of up to $12,000 to consumers. Long Beach generally attempts to underwrite applications to the level proposed by the submitting broker or loan officer.

16. Long Beach has not properly instructed its employees or brokers regarding their obligation to treat prospective customers without regard to race, national origin, gender or age; and the lender has failed to supervise or monitor the performance of employees and brokers to ensure that loan proposals would lead to compliance with fair lending laws.

17. In addition to a borrower's risk level, Long Beach's loan pricing system has been based on the race, national origin, gender or age of the applicant. Information as to each applicant's race, national origin, gender and age has been available and known to employees and brokers, as well as to officials of Long Beach who have made the decisions to grant or deny loans and to set or confirm the terms and conditions of any loan granted. The totality of loan originations by Long Beach reveals that African Americans, Latinos, women, and persons over the age of 55 were charged higher prices for their loans than the terms and conditions granted to persons without those characteristics who presented similar levels of risk to the lender.

18. Long Beach has used a number of devices to obtain higher prices from African Americans, Latinos, women and persons over the age of 55. Long Beach has directed its marketing efforts toward persons and neighborhoods, particularly minority neighborhoods, that Long Beach officials believed might be susceptible to the higher prices that would be demanded by the lender without stating the cost of its loans or that the cost of its loans was substantially higher than "A" mortgage lenders. In dealing with consumers, loan officers and brokers have emphasized low monthly payment amounts when discussing the price of the loan, rather than interest rate, points, or Annual Percentage Rate. These methods have allowed Long Beach to present terms and conditions that appeared to be favorable to the consumer, but in fact would cost the consumer considerably more money than was necessary to obtain the loan, given the turnover rate of the



loans at issue (described in paragraph 11 above).

19. Loan originations also reveal that the combination of factors of race, national origin, gender, and age contributed to an increase in the price of the loans extended by Long Beach. For example, for loans brought in by Long Beach's loan officers, African American females over the age of 55 were 2.6 times more likely than white males under age 56 to be charged fees and points that amounted to 6% or more of the loan amount. For loans brought in by the lender's wholesale brokers, older African American females were almost four times as likely as younger white males to be charged fees in this range.

20. After being made aware of possible unlawful pricing discrimination in its mortgage lending operations following the OTS examination in 1993, Long Beach officials imposed lower ceilings on the costs that could be charged to consumers. However, in 1994, after relinquishing its charter as a regulated thrift institution, Long Beach abandoned the limitations that had been adopted to address possible fair lending violations.

## IV. CLAIMS OF DISCRIMINATION

21. The disparities between the terms and conditions of financing extended to African Americans, Latinos, women and persons over the age of 55 and the terms and conditions extended to persons without such characteristics could not have occurred by chance and cannot be explained by factors unrelated to race, national origin, gender or age.

22. The defendant's policies and practices, as described herein, constitute:

   a. A pattern or practice of resistance to the full enjoyment of rights secured by the Fair Housing Act, as amended, 42 U.S.C. §§ 3601-3619, and the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691-1691f; and

   2. A denial of rights granted by the Fair Housing Act, as amended, to a group of persons that raises an issue of general public importance.

23. Specifically, the pattern or practice, as alleged herein, constitutes:

   a. Discrimination on the basis of race, national origin, or sex in making available residential real estate-related transactions in violation of Section 805 of the Fair Housing Act, 42 U.S.C. § 3605(a); and

   2. Discrimination against applicants with respect to credit transactions, on the basis of race, national origin, age, or sex in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a)(1).

24. Persons who have been victims of Long Beach's discriminatory policies and practices are aggrieved persons as defined in 42 U.S.C. § 3602(i) and the ECOA, and have suffered damages as a result of Long Beach's conduct as described herein.

25. The discriminatory policies and practices of the defendant were intentional and willful, and were implemented with deliberate disregard for the rights of African Americans, Latinos, women, and persons over the age of 55.



## V.  REQUEST FOR RELIEF

WHEREFORE, the United States prays that the Court enter an ORDER that:

1.  Declares that the policies and practices of the defendant constitute a violation of Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. SS 3601-3619, and the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691-1691f;

2.  Enjoins the defendant, its agents, employees, successors, and all other persons in active concert or participation with it, from discriminating on account of race, national origin, sex, or age in any aspect of its home equity or mortgage lending activities;

3.  Requires the defendant to develop and submit to the Court for its approval a detailed plan that: (a) remedies the vestiges of defendant's discriminatory policies and practices; and (b) recognizes appropriate business justification for pricing loans on the basis of the risk posed to the lender and also recognizes appropriate pricing differences between retail and wholesale loan originations, but ensures that the pricing of loans extended by the lender is not based, in any way, on the race, national origin, gender or age of the applicant;

4.  Awards such damages as would fully compensate the victims of the defendant's discriminatory policies and practices for the injuries caused by the defendant;

5.  Awards punitive damages to the victims of the defendant's discriminatory policies and practices; and

6.  Assesses a civil penalty against the defendant in order to vindicate the public interest.

7.  The United States further prays for such additional relief as the interests of justice may require.

Respectfully submitted,

JANET RENO
ATTORNEY GENERAL

DEVAL L. PATRICK
ASSISTANT ATTORNEY GENERAL

PAUL F. HANCOCK
Chief, Housing and Civil Enforcement Section

ALEXANDER C. ROSS
JENNIFER C. CASS
GAVIN C. DOWELL
Attorneys, Housing and Civil Enforcement Section
Civil Rights Division
U.S. Department of Justice
P.O. Box 65998
Washington, D.C. 20035-5998
(202) 307-2896

NORA MANELLA
UNITED STATES ATTORNEY
FOR THE CENTRAL DISTRICT OF CALIFORNIA

LEON W. WEIDMAN
Civil Chief
Assistant United States Attorney

PAMELA L. JOHNSTON
Assistant United States Attorney
United States Attorney's Office
7516 Federal Building
300 N. Los Angeles Street
Los Angeles, CA 90012
(213) 894-0444

ATTORNEYS FOR PLAINTIFF

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA**

UNITED STATES OF AMERICA,
    Plaintiff,

v.

                                                             96-6159

LONG BEACH MORTGAGE COMPANY,
    Defendant.

---

### SETTLEMENT AGREEMENT AND ORDER THEREON

The United States of America and Long Beach Mortgage Company have agreed to enter into this Stipulated Order and Settlement Agreement ("Agreement") simultaneously with the filing by the United States of its Complaint alleging violations of the Fair Housing Act (42 U.S.C. §§ 3601-3619) and the Equal Credit Opportunity Act (15 U.S.C. § 1691-1691f) by Long Beach Bank FSB (the "Bank"), the predecessor in interest to Long Beach Mortgage Company ("LBMC") , to resolve fully and finally all claims asserted, or that could have been asserted, arising out of or relating to the matters referred to in the Complaint.

## I. __INTRODUCTION__

The Bank operated in what the lending industry calls the "B/C" credit market (in which market LBMC currently operates), where borrowers, usually because of their impaired credit, paid prices higher than for "A" residential mortgage loans to compensate for increased risk to the lender ("B/C" residential mortgage loans are hereafter referred to as "mortgage loans"). The Complaint alleges that during the period January 1991 through June 1994, the Bank engaged in lending practices that constituted unlawful discrimination on the basis of race, national origin, gender and age. The United States maintains that evidence, including a statistical analysis, shows (1) that the Bank treated African American, Hispanic, female or older borrowers differently from younger, white male borrowers by charging them higher prices for mortgage loans and (2) that there is no non-discriminatory explanation for this difference in treatment. The United States does not claim that the Bank discriminated in charging borrowers a risk-related premium, but rather in the additional discretionary amounts that were charged by its loan officer employees and its wholesale brokers.

The Complaint alleges that a lender is responsible for discriminatory loan prices in the entirety of its lending operations. The Complaint further alleges that while "retail" loans were generated through employees of the Bank and "wholesale" loans were generated through independent third-party mortgage brokers, the Bank retained the right to determine whether to grant the loan and to set the terms and conditions of financing, and any resulting credit was extended by and in the name of the Bank.

LBMC denies all allegations in the Complaint and all claims made by the United States of discrimination by the Bank. LBMC disputes the validity of the statistical analysis relied upon by the United States as the principal basis for its claims and further maintains that the United States' theories of liability regarding wholesale lending are legally unsupportable.

LBMC acknowledges that some borrowers may pay higher prices for mortgage loans because of limited credit availability or lack of borrower sophistication and knowledge of alternative credit sources. LBMC asserts that these problems could be better addressed by intensive national efforts in consumer education and industry-wide initiatives directed at employee and broker education and training. Nevertheless, LBMC states that, whatever its differences with the United States as to the characterization of past events, it shares the goal of the United States of assuring that considerations such as race, national origin, gender or age play no role whatsoever in the price of credit, and LBMC is entering into this Agreement in order to further that goal.

The United States acknowledges that LBMC cooperated fully during the United States' investigation of this matter. Moreover, LBMC is willing to further the spirit of the fair lending laws by adopting creative remedies such as taking a leadership role in the consumer education initiatives described in this Agreement.

The United States recognizes the important role that consumer education initiatives can have in complementing the remedial aspects of this Agreement that directly address the violations alleged in the Complaint and the invaluable service LBMC can provide by taking a leadership role in these endeavors. It also commends LBMC for its willingness to commit substantial funds to an ambitious project that is designed to accomplish the objectives of the fair lending laws.

## II.  **RESOLUTION OF THE DISPUTE**

The parties have agreed that to avoid costly litigation this controversy should be resolved voluntarily. The parties have also agreed that there should be no evidentiary hearing, trial or other adjudication on the merits, and that entry of this Agreement is not to be construed as an admission by LBMC of the validity of the claims asserted against it as successor in interest to the Bank.

Now, therefore, on the basis of the foregoing, the United States and LBMC agree, and the Court orders as follows:

## III.  **GENERAL UNDERTAKING**

1. LBMC, its officials, employees, and agents, as well as successors, will not engage in any act or practice that discriminates on the basis of age, sex, race or national origin in the pricing of mortgage loans as prohibited by the Fair Housing Act (42 U.S.C. §§ 3601-3619) and the Equal Credit Opportunity Act (15 U.S.C. § 1691-1691f). The parties agree that this undertaking, and every other undertaking contained in this Agreement, shall be enforceable by order of this Court upon application therefor by the United States or LBMC, as the case may be. The party making such application shall have the burden of proving its entitlement to the order sought.

## IV.  **SPECIFIC UNDERTAKINGS**

2. LBMC has formulated and agreed to implement the following measures with respect to its retail mortgage lending operations to address the concerns raised by the United States:

### A.  **Training for LBMC Retail Personnel**

3. Within ninety (90) days after the date of this Agreement, officers, directors, and LBMC employees involved in retail mortgage loan pricing shall complete a training course appropriate for the duties and responsibilities of each such individual. The training courses shall include the

following elements:

    a.  a detailed discussion of LBMC's responsibilities under this Agreement;

    2.  a detailed discussion of the purpose of, and prohibitions contained in, the Fair Housing Act and the Equal Credit Opportunity Act;

    3.  a detailed discussion of individual and principal liability for violations of the Fair Housing Act and the Equal Credit Opportunity Act;

    4.  a detailed discussion of LBMC's policies regarding discrimination, including the policy that it is unlawful for LBMC personnel to make differing initial price quotations on the basis of a loan applicant's race, national origin, sex or age;

    5.  a detailed discussion regarding LBMC's disciplinary policy regarding violations of the Fair Housing Act and the Equal Credit Opportunity Act by employees; and

    6.  a detailed discussion of the applicability of fair lending laws to mortgage loan pricing.

4.  Commencing ninety (90) days after the date of this Agreement and thereafter for the duration of this Agreement, new LBMC employees involved in retail mortgage loan pricing shall complete the training course described in Paragraph 3 of this section within thirty (30) days of employment with LBMC.

5.  Each person required to complete a training course under Paragraphs 3 or 4 of this Agreement shall execute a form, which shall be maintained by LBMC, acknowledging:

    a.  completion of the training course;

    2.  that they have received, read and understand LBMC's policies regarding discrimination, including LBMC's disciplinary policy regarding violations of the Fair Housing Act and the Equal Credit Opportunity Act;

    3.  that they understand that violations of the Fair Housing Act and the Equal Credit Opportunity Act may subject them to individual liability, judicial sanctions, and/or administrative sanctions; and

    4.  that they understand that violations of the Fair Housing Act and the Equal Credit Opportunity Act may subject LBMC to liability, judicial sanctions, and/or administrative sanctions.

## B.  **Accurate Risk Classifications**

6.  LBMC relies in part upon risk-based pricing in the pricing of its mortgage loans. Insofar as LBMC desires to continue to utilize risk-based pricing, LBMC shall use its best efforts to place mortgage loan applicants in appropriate risk classifications based on objective credit and risk-related criteria.

## C.  **Retail Mortgage Loan Monitoring system**

7. Within one hundred eighty (180) days of the date of this Agreement, LBMC shall develop and implement a system by which it shall use a statistical model to monitor retail mortgage loan prices on an ongoing basis and shall submit a written description of the statistical model to the United States in accordance with the terms and conditions of Appendix A, which is attached hereto and incorporated herein by reference.

8. The parties understand and agree that, from time to time, circumstances may require modification of the monitoring system consistent with the requirements of Paragraph 7 of this Agreement. Any material modification of the monitoring system shall be documented, and such documentation shall be provided to the United States prior to implementation of any such changes.

9. LBMC's compliance personnel shall review the results of the monitoring system on at least a quarterly basis. This quarterly review shall include both a review of the prior quarter's loan activity and the cumulative loan activity of LBMC from the date of implementation of the monitoring system. The compliance personnel shall produce a written report no less often than quarterly summarizing its findings related to its review of the monitoring system. A special fair lending compliance committee ("Compliance Committee"), consisting of senior management, shall review the quarterly findings of LBMC's compliance personnel. The Compliance Committee shall also issue a quarterly written report summarizing its review of the monitoring system. This report shall consist of:

    a. a general report of LBMC's performance in the pricing of funded retail mortgage loans to members of protected classes;

    2. descriptive statistics of funded retail mortgage loan prices broken down by age, sex, race and national origin. LBMC shall prepare reasonable additional statistical analyses of the performance of LBMC at the request of the United States if the United States deems them necessary measure compliance with the terms of this Agreement. If the parties are unable to reach agreement on the nature of any follow-up analyses to be conducted, the matter may be submitted to the Court for resolution; and

    3. the written reports of the compliance personnel as described in this Paragraph.

10. If the retail monitoring system reveals material, unexplained pricing disparities, the responsible person(s) will be appropriately counseled and advised that if a material variance is found among loans in the calendar quarter following such counseling, LBMC will take one or more of the following steps, as appropriate:

    a. deduct from future commission payments price-related commissions contributing to the material variance during this period;

    2. suspend or limit pricing flexibility by the responsible person(s);

    3. institute closer monitoring; and/or

    4. suspend or discharge the employee(s) responsible for the discriminatory conduct.

11. Nothing in this Agreement shall be interpreted to require LBMC, in analyzing the results from its retail monitoring system, to compare retail mortgage loans to wholesale mortgage loans or otherwise to compare prices paid by borrowers who are not similarly situated.



## V. **CONSUMER EDUCATION PROGRAM**

12. LBMC will contribute a total of one million dollars ($1,000,000) to consumer education programs in conjunction with civil right groups. This amount will be paid in three equal annual installments commencing ninety (90) days after the date of this Agreement. A committee made up of representatives from LBMC and from leading, national civil rights groups chosen by LBMC will determine the recipients and specific allocation of the foregoing amount. The consumer education campaign will include the distribution of informative pamphlets or other forms of literature and sponsorship of educational workshops or forums focusing on:

    a. the fact that different residential mortgage loan products carry different prices, and that different sources may charge different prices for essentially the same product, and that the same source may charge different prices for the same product;

    2. the importance of shopping among different providers of credit, and questions to ask while shopping;

    3. how to evaluate and compare the ultimate price of competing loan products; and

    4. options available for borrowers with impaired credit.

## VI. **POLICIES AND PRACTICES RELATED TO WHOLESALE MORTGAGE LOANS**

### A. **Education of Mortgage Brokers**

13. To promote the objectives of the fair lending laws, in connection with its wholesale mortgage loan operations, LBMC shall inform all brokers with which it has an existing contractual arrangement and all brokers with whom it creates a contractual relationship for the duration of this Agreement:

    a. that LBMC will adhere to the Fair Housing Act and the Equal Credit Opportunity Act in all aspects of the credit process including the pricing of mortgage loans;

    2. that LBMC maintains loan underwriting standards designed to ensure that loan applicants will be placed at the correct credit risk level on a non-discriminatory basis;

    3. that LBMC's wholesale price sheets reflect the price it seeks to obtain for mortgage loans at each credit risk level and that the wholesale broker may charge borrowers such additional amounts as may be permitted by applicable law;

    4. that LBMC reserves the right to reject the broker's proposal or make a counteroffer when it believes the broker's proposed compensation and costs are not permitted under the fair lending laws; and

    5. that each wholesale broker must provide the proposed borrower with such disclosures concerning broker compensation as may be required under applicable law.

14. LBMC shall offer all wholesale brokers with whom it does mortgage loan business the opportunity to undergo fair lending training similar to the training described in Paragraphs 3b, 3c and 3d of this Agreement.



## B. Expanded Documentation for Wholesale Loans

15. In the event that LBMC agrees to a mortgage broker's request for an exception to the prices on wholesale mortgage loans set forth on LBMC's rate sheet, LBMC will ensure that the non-discriminatory reasons for any such price exception is documented in the loan file.

16. LBMC agrees that it will periodically review the results of its wholesale lending operations for its compliance with fair lending laws. To the extent LBMC prepares any statistical analyses or other reports constituting or relating to such review, such analyses or reports shall be confidential information and LBMC shall not be obligated to disclose such documents or information, if any, to the United States or third parties. Furthermore, nothing in this Agreement shall be interpreted to require LBMC to disclose the identities of the wholesale brokers with whom it does business.

## VII. MONETARY COMPENSATION

17. Within ninety (90) days of the date of this Agreement, LBMC shall place three million dollars ($3,000,000) into a Long Beach Mortgage Company Settlement Agreement Compensation Fund ("the Fund"). The Fund shall be maintained in an interest-bearing account. The purpose of the Fund is to compensate all those whom the United States alleges were injured by the Bank's lending practices.

18. It is agreed and understood between the parties that the United States shall have sole discretion to determine who is entitled to receive compensation from the Fund. The United States has determined:

    a. two million dollars ($2,000,000) of the Fund shall be used to reimburse retail borrowers, and one million dollars ($1,000,000) of the Fund shall be used to reimburse wholesale borrowers;

    2. there is a total of no more than twelve hundred (1,200) borrowers entitled to reimbursement;

    3. the payments provided under the terms of this Agreement shall be full and adequate compensation to all retail and wholesale borrowers identified by the United States as having been discriminated against.

19. Within thirty (30) days of the date of this Agreement, the United States shall provide LBMC with a list of loan numbers for borrowers it believes should receive compensation. The list shall designate the amount of compensation payable in connection with each loan.

20. Using a notice in the form set forth in Attachment I ("Notice"), LBMC shall notify by registered mail, return receipt requested to the last known address as reflected in LBMC's records, all persons identified by the United States pursuant to Paragraph 19 of the nature of the settlement and of their right to receive compensation. The Notice will include a requirement that the borrower respond within forty-five (45) days of the date of the Notice and execute a general release, as set forth in Attachment II, of any claims related to the mortgage loan at issue. LBMC will notify the United States of the names and addresses of all persons from whom no return receipt has been received within thirty (30) days of the mailing of the Notice, and the United States shall have an additional sixty (60) days to locate such borrowers and provide them with a copy of the Notice.

21. If a timely response pursuant to Paragraph 20 is received, LBMC will issue a check to the borrower, in the amount designated by the United States pursuant to Paragraph 19, within is ten (10) business days of the establishment of the Fund or receipt of the executed release, whichever is later.

22. The cost of the mailings provided for in Paragraphs 20 and 21 of this Agreement shall be paid by LBMC. All interest that accrues on the Fund shall be paid to LBMC to help defray the costs of administering the Fund.

23. Any money left in the Fund after all disbursements to borrowers shall be used to supplement the second installment of LBMC's contribution to the consumer education program described in Paragraph 12.

## VIII. RECORDKEEPING AND REPORTING REQUIREMENTS

24. For a period of three (3) years from the date of this Agreement, LBMC agrees to retain all loan application files submitted for mortgage loans and all loan-related documents and notices relevant to any pricing decisions. During this period, upon reasonable notice from the United States, LBMC shall make individual mortgage loan application files and related records available for inspection and copying by the United States.

25. For a period of three (3) years from the date of this Agreement, LBMC shall report its compliance with this Agreement to the Civil Rights Division of the United States Department of Justice semi-annually.[1] The reports shall be submitted to the United States within ninety (90) days after the last business day of LBMC's second and fourth fiscal quarters. This reporting shall consist of the written reports of the compliance personnel and the Compliance Committee as described in Paragraph 9.

## IX. RETENTION OF JURISDICTION; MISCELLANEOUS

26. The Court shall retain jurisdiction over the parties and of this matter for a period of three (3) years from the date this Agreement is entered by the Court solely for the purpose of enforcing the terms of this Agreement (as may be hereafter modified by the parties in writing). Except as otherwise expressly set forth above, either party may object to any aspect of the interpretation of, implementation of or compliance with this Agreement within forty-five (45) days of learning of the objectionable aspect. Either party may bring a matter to the Court for resolution only after the parties have endeavored in good faith to resolve informally any difference relating to the interpretation, implementation or compliance with this Agreement. The sole remedy available to the United States with respect to any breach by LBMC of any provision of this Agreement, and any modification(s) thereto, shall be an application to this Court to enforce this Agreement in accordance with its terms, and in no event may the United States seek to pursue any claim against LBMC that was or could have been asserted, or that arises out of or relates to any of the matters referred to, in the Complaint. The United States hereby agrees that at any time on or after the expiration of 180 days from the entry of this Agreement by the Court, either party may seek, and shall be entitled to obtain, an order from the Court dismissing the Complaint with prejudice. This Agreement shall remain in effect for a period of three (3) years from the date it is entered by the Court.

27. The terms of this Agreement shall be binding upon LBMC and its successors.

28. This Agreement may be modified at any time by written agreement of the parties, and without the need for any Court approval of any such modification. Any and all such written modifications shall be considered to be part of this Stipulated Order and Settlement Agreement.

29. For purposes of measuring time periods, the "date of" this Agreement shall be deemed to be the date of its entry by the Court.

30. Each party to this litigation shall bear its own costs and attorneys' fees.

It is so agreed by the parties and approved and ordered by the

Court as evidenced by their respective signatures on the attached page.

SO ORDERED:

DICKRAN TEVRIZIAN
UNITED STATES DISTRICT COURT JUDGE

DATE: SEPTEMBER 5, 1996

Stipulated and agreed to this 3rd day of September, 1996.

FOR PLAINTIFF UNITED STATES OF AMERICA:

DEVAL L. PATRICK
Assistant Attorney General

PAUL F. HANCOCK
Chief, Housing and Civil Enforcement Section

ALEXANDER C. ROSS
Special Litigation Counsel

JENNIFER C. CASS
GAVIN C. DOWELL
Trial Attorneys
U.S. Department of Justice
Civil Rights Division
P.O. Box 65998
Washington, DC 20035-5998
(202) 514-4713

FOR DEFENDANT LONG BEACH MORTGAGE COMPANY:

RICHARD L. THORNBURGH
RONALD W. STEVENS
LAURENCE E. PLATT
THOMAS J. NOTO
Kirkpatrick & Lockhart LLP
Suite 200



1800 Massachusetts Ave., N.W.
Washington, DC 20036-1800
(202) 778-9000

---

## **APPENDIX A**

Pursuant to paragraph 7 of the Stipulated Order and Settlement Agreement, LBMC will provide the United States with a written description of the statistical model that it intends to use to monitor its retail mortgage loan prices. LBMC will identify for the United States the variables that LBMC intends to incorporate in this statistical model. The United States shall notify LBMC in writing as soon as practicable of any objections it may have to any of the variables identified by LBMC and the reasons for such objection. It is understood and agreed that LBMC shall have no liability whatsoever to any person or entity for any price disparities that are attributable to the good faith use of any particular variable(s) prior to the date on which LBMC receives written notification from the United States of its objection to the use of such variable(s) and its reason(s) for such objection(s).

If the parties are unable to resolve the matter informally within the thirty (30) day period following the date of LBMC's receipt of the United States' written objection(s), the United States may petition the Court within fifteen (15) days of the end of the aforesaid thirty (30)-day period for a declaration that statistically significant price differences attributable solely to any variable(s) to which it has objected in writing would violate the Equal Credit Opportunity Act or the Fair Housing Act. Any findings of fact and law necessary for such a declaration shall be made by the Court.

In connection with any proceeding initiated by the United, States to obtain such a declaration, nothing contained in this Agreement shall be deemed to constitute a waiver by either the United States or LBMC with respect to, or otherwise estop either of them from presenting to the Court, any argument either party may otherwise have regarding the validity of any variable or of any other argument raised by the United States in support of any assertion that LBMC's conduct with respect to the pricing of mortgage loans has resulted in a purported violation of the Equal Credit Opportunity Act or the Fair Housing Act.

If and only if the United States both serves a written notice of objection(s) to the use of any particular variable(s) upon LBMC and subsequently petitions the Court for a declaration as aforesaid, then, in the event that the Court rules in favor of the United States, LBMC shall be liable to any borrower whose actual mortgage loan price materially exceeds the mortgage loan price predicted for such borrower by a statistical model that does not include the variable(s) found by the Court to be invalid and to have resulted in a violation of the Equal Credit Opportunity Act or the Fair Housing Act ("out-of-pocket expenses"). LBMC's liability to any such borrower shall be determined as of the date that LBMC received written notice from the United States of its objection(s) to the variable(s) at issue, and shall be limited to reimbursement to the borrower(s) of his/her/their out-of-pocket expenses.

In the event that LBMC's use of a model that has been accepted by the United States reveals that any borrower was discriminated against based on a prohibited factor, LBMC shall provide compensation to such borrower equal to his/her/their actual out-of-pocket expenses. The intent of the parties is to limit compensation in any and all cases to actual out-of-pocket amounts paid by any borrower and the United States agrees not to seek additional damages or penalties in connection with any such material price differences; provided, however, that the United States may seek additional damages or penalties if it can demonstrate that LBMC's continued use of any variable to which the United States objected in writing and which is subsequently found by the Court to be invalid and to have resulted in a violation of the Equal Credit Opportunity Act or the Fair Housing Act, was done in bad faith and without any reasonable

basis for believing that such variable could validly be used in the statistical model. In this respect, the fact that LBMC continued to use any such variable(s) after receipt of written notice from the United States of its objection(s) thereto shall not, of itself, be sufficient to establish that LBMC's continued use of such variable was in bad faith and/or unreasonable.

## ATTACHMENT I

## FORM OF NOTICE

Dear _____:

Long Beach Mortgage Company ("LBMC") is the successor in interest to Long Beach Bank ("the Bank"). Our records indicate that during the period January 1991 through June 1994, you obtained a mortgage loan from the Bank (the "Loan"). LBMC and the United States Department of Justice ("United States") recently settled a lawsuit in which the United States alleged that from January 1991 through June 1994, the policies and practices of the Bank resulted in certain African American, Hispanic, female and older (persons over the age of 55) customers paying a higher price on their mortgage loans than similarly situated younger white male customers of the Bank.

We have denied those allegations and continue to assert that the Bank never discriminated in its mortgage loan business. Nevertheless, we have agreed with the government to voluntarily resolve this controversy, in part, through the payment of money to those persons identified by the United States as allegedly injured by these practices.

The terms of the settlement between the United States and LBMC are incorporated in a Stipulated Order and Settlement Agreement ("Agreement") signed by the parties and signed and approved by the United States District Court for the Central District of California ("Court"), and which is available upon written request from the Clerk of the Court at the following address:

[Address]

In addition to the establishment of a $3 million settlement fund ("Fund") to be used to compensate 1,200 retail and wholesale borrowers, the Agreement provides that, for a period of three years, LBMC will (1) not engage in any act or practice that violates any federal fair lending law; (2) conduct training courses for LBMC's existing and future employees involved in retail mortgage loan pricing regarding LBMC's obligations under the Agreement, the purpose and content of federal fair lending laws and LBMC's own policies prohibiting violations of such laws; (3) use its best efforts to place mortgage loan applicants in appropriate risk classifications based on objective credit and risk-related criteria; (4) develop and implement a statistical model to monitor retail mortgage loan prides on an ongoing basis, which model is subject to review by the United States; (5) conduct a quarterly review of, and prepare written reports regarding, the results of the retail monitoring system, and if such system reveals material, unexplained pricing disparities, provide appropriate counselling to the responsible persons and determine whether to take one or more additional steps (reduction of commissions, suspension or limitation of pricing flexibility by the responsible person, closer monitoring and/or suspension or discharge of the responsible persons) ; (6) inform all wholesale brokers with whom it has a contractual relationship that LBMC adheres to the fair lending laws, will offer to provide training in such laws to brokers, seeks to ensure that loan applicants are placed in the appropriate credit risk level on a non-discriminatory basis, uses wholesale price sheets that reflect the price LBMC seeks to obtain at each credit risk level and that wholesale brokers may charge such additional amounts as may be permitted by applicable law, LBMC



reserves the right to reject a broker's proposal or make a counteroffer when it believes the broker's proposed compensation and costs are not permitted under the fair lending laws and that each broker must provide the proposed borrower with all disclosures required by law; and (7) periodically review the results of its wholesale lending operations for its compliance with fair lending laws.

Pursuant to the Court-approved Agreement, the government has determined that you should receive a payment of $_____ in connection with your Loan. The United States believes the money you are entitled to receive is full and adequate compensation for your potential claim. If you desire to receive this money, you must sign the General Release enclosed with this letter in which you agree to accept this money in exchange for your full release of LBMC in connection with the Loan. The release waives your right to sue for any claim you might have arising out of or relating to the Loan. You must sign this release in the presence of a notary public, and return the signed release to:

> Long Beach Mortgage Company
> 1100 Town & Country Road
> Suite 1100
> Orange, California 92668
> Attn: Consumer Relations Department

The signed and notarized release must be returned to the above address no later than _____, 1996 [forty-five (45) days after the date of this letter]. If LBMC receives the executed release by such date, LBMC will mail a check to you, in the amount specified above, within ten (10) business days after the Fund is established and receipt by LBMC of your fully executed release. The method of delivery of the release is at your option but registered mail, return receipt requested, is recommended. If you do not want to participate in this settlement, you may decline to do so and thereby give up your right to receive money under the Agreement while retaining the right to hire your own attorney and proceed on your own.

Sincerely,

---

## ATTACHMENT II

## FORM OF

## GENERAL RELEASE

STATE OF CALIFORNIA

COUNTY OF _____

WHEREAS I/we, _____ and _____, understand that the United States Department of Justice ("the United States") has conducted an investigation of Long Beach Bank, FSB ("the Bank"), and has alleged that with respect to certain mortgage loans originated during the period January 1, 1991, through June 30, 1994, the Bank violated provisions of the Fair Housing Act and the Equal Credit Opportunity Act;

WHEREAS, I/we understand that the Bank and its successor in interest Long Beach Mortgage Company ("LBMC") categorically deny that the Bank violated any provisions of the Fair Housing Act or the Equal

Credit Opportunity Act;

WHEREAS, I/we obtained a mortgage loan with the Bank between January 1, 1991 and June 30, 1994 (the "Loan");

WHEREAS, I/we understand that in order to avoid costly litigation, LBMC and the United States have resolved the matter by entering into a Stipulated Order and Settlement Agreement ("Agreement") that has been approved by the United States District Court for the Central District of California ("Court"), and that I/we will be entitled to a payment from a Settlement Fund ("Fund") established pursuant to the Agreement provided that we execute the General Release described below;

THEREFORE, I/we agree to the following:

In consideration of _____ to be paid to me/us out of the Fund, I/we hereby agree, effective upon receipt of payment, to release and forever discharge LBMC and its current, former, and future officers, directors, employees, agents, parent companies, affiliates, predecessors, and successors from any and all legal and equitable claims or causes of action, whether or not known or suspected to exist as of the date of execution of this General Release, that have been or might have been asserted by me/us or the United States, as of the date of execution of this General Release, that arise out of or relate to the Loan.

I/we understand that the payment to be made to me/us does not constitute an admission by the Bank or LBMC of the validity of any claims made by me/us or by the United States on our behalf.

I/we understand that there will be only one compensation payment even though there may have been two or more co-applicants and that the above-designated payment will be the sole and total compensation paid to us arising out of the Loans.

I/we acknowledge that I/we understand and are waiving my/our right to pursue my/our own legal action instead of accepting payment from the Fund.

With respect to any and all claims released hereby, the undersigned stipulate and agree to expressly waive and relinquish, to the fullest extent permitted by law, the provisions, rights, and benefits of § 1542 of the California Civil Code, which provides:

> A general release does not extend to claims which the creditor does not know
> or suspect to exist in his favor at the time of executing the release, which if
> known by him must have materially affected the settlement with the debtor.

This General Release constitutes the entire agreement between LBMC and me/us, without exception or exclusion.

I/we have read this General Release and understand the contents hereof, and I/we execute this General Release of my/our own free act(s) and deed(s).

Signed this _____ day of _____, 1996.

Borrower _____

Borrower _____

On _____, 1996, before me personally appeared _____ and _____, proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same.

WITNESS my hand and official seal.

Notary Public

(SEAL)

_____

1. All notices, correspondence, reports, or documents required to be provided to the United States shall be mailed to the following address:

      Chief, Housing and Civil Enforcement Section
      Civil Rights Division
      U.S. Department of Justice
      P.O. Box 65998
      Washington, D.C. 20035

PH/DOVER                        3126749085            OCT            10:48  No.013 P.02
                                                      E OF DELAWARE
                                                      ETARY OF STATE
                                                   DIVISION OF CORPORATIONS
                                                   FILED 09:00 AM 10/06/1994
                                                   944189547 - 2409839

# AMENDED AND RESTATED CERTIFICATE OF INCORPORATION
## OF
## LONG BEACH MORTGAGE COMPANY

The undersigned Corporation does hereby certify as follows:

    1.    The name of the Corporation is Long Beach Mortgage Company, the name under which it was originally incorporated.

    2.    The original Certificate of Incorporation of the Corporation was filed in the Office of the Secretary of State of the State of Delaware on June 17, 1994.

    3.    This Amended and Restated Certificate of Incorporation has been duly adopted in accordance with Sections 242 and 245 of the General Corporation Law of the State of Delaware.

    4.    The text of the Certificate of Incorporation of the Corporation is hereby amended and restated to read in its entirety as follows:

### ARTICLE I

### NAME OF CORPORATION

The name of the Corporation is Long Beach Mortgage Company.

### ARTICLE II

### REGISTERED OFFICE

    The address of the registered office of the Corporation in the State of Delaware is 1209 Orange Street, Wilmington, County of New Castle. The name of the registered agent of the Corporation at such address is The Corporation Trust Company.

### ARTICLE III

### PURPOSE

    The purpose of this Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of the State of Delaware ("GCL").

### ARTICLE IV

### AUTHORIZED CAPITAL STOCK

    4.01   Number, Classes and Par Value of Shares. The Corporation is authorized to issue two classes of stock designated "Common Stock" and "Preferred Stock," respectively. The total number of shares of stock that the Corporation is authorized to issue is 5,100,000. The number of shares of Common Stock that the Corporation is authorized to issue is 5,000,000, and the number of shares of Preferred Stock that the Corporation is

authorized to issue is 100,000. All shares of Common Stock and Preferred Stock shall have a par value of $.01 per share.

4.02    Designation of Series of Preferred Stock By Board of Directors. The shares of Preferred Stock may be issued from time to time in one or more series. The Board of Directors is hereby granted the express authority to fix by resolution or resolutions the designations and number of shares constituting any such series and the powers, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, including without limitation the voting powers, dividend rights, conversion rights, redemption rights and liquidation preferences, of any series of shares of Preferred Stock, and to increase or decrease the number of authorized shares of any series subsequent to the issue of that series, but not below the number of shares of such series then outstanding. In case the authorized number of shares of any series shall be so decreased, the shares constituting such decrease shall resume the status which they had prior to the adoption of the resolution originally fixing the number of shares of such series. Shares of Preferred Stock that are redeemed, purchased, or otherwise acquired by the Corporation may be reissued except as otherwise provided by applicable law or the applicable certificate of designation.

## ARTICLE V

## LIMITATION OF DIRECTOR LIABILITY

To the fullest extent permitted by the GCL as the same exists or may hereafter be amended, a director of the Corporation shall not be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. The liability of a director of the Corporation to the Corporation or its stockholders for monetary damages shall be eliminated to the fullest extent permissible under applicable law in the event it is determined that Delaware law does not apply. The Corporation is authorized to provide by bylaw, agreement or otherwise for indemnification of directors, officers, employees and agents for breach of duty to the Corporation and its stockholders to the fullest extent permitted by applicable law. Any repeal or modification of this Article V shall not result in any liability for a director with respect to any action or omission occurring prior to such repeal or modification.

## ARTICLE VI

## BOARD POWER REGARDING BYLAWS

In furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind the Bylaws of the Corporation.

## ARTICLE VII

## ELECTION OF DIRECTORS

7.01    No Written Ballot. Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

7.02    Cumulative Voting. In the event the Corporation should be subject to the provisions of Section 708 (a), (b) and (c) of the California Corporations Code ("Code") by reason of the applicability of Section 2115 of the Code, then so long as the Corporation is subject to the provisions of said Section 2115, in any election of directors of the Corporation, a holder of any class or series of stock then entitled to vote in such election shall be entitled to

2

 

PH/DOVER    3128749085    UCT    10:51 No.013 P.04

as many votes as shall equal (i) the number of votes which (except for this Section 7.02 as to cumulative voting) such stockholder would be entitled to cast for the election of directors with respect to such stockholder's shares of stock, multiplied by (ii) the number of directors to be elected in the election in which such stockholder's class or series of shares is entitled to vote, and each shareholder may cast all of such votes for a single director or for any two or more of them as such stockholder may see fit.  Except as set forth above in this Section 7.02, the stockholders of this Corporation shall not be entitled to cumulate votes in the election of directors.

## ARTICLE VIII

## CORPORATE POWER

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Amended and Restated Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred on stockholders herein are granted subject to this reservation.

IN WITNESS WHEREOF, the undersigned Corporation has executed this Amended and Restated Certificate of Incorporation effective as of September 1, 1994.

LONG BEACH MORTGAGE COMPANY

By:  _M. Jack Mayesh_
     M. Jack Mayesh, President

ATTEST:

_Jon R. Daurio_
Jon R. Daurio, Secretary

CA942550.134/2+

3



TE OF DELAWARE
RETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 08/09/1996
960233234 - 2409839

## CERTIFICATE OF CHANGE OF LOCATION OF REGISTERED OFFICE
## AND OF REGISTERED AGENT

It is hereby certified that:

      1.  The name of the corporation (hereinafter called the "Corporation") is LONG BEACH MORTGAGE COMPANY.

      2.  The registered office of the corporation within the State of Delaware is hereby changed to 9 East Loockerman Street, City of Dover  19901, County of Kent.

      3.  The registered agent of the corporation within the State of Delaware is hereby changed to National Registered Agents, Inc., the business office of which is identical with the registered office of the corporation as hereby changed.

      4.  The corporation has authorized the changes hereinbefore set forth by resolution of its Board of Directors.

Signed on August 7, 1996.


                                  _____
                           Norman R. Gritsch, Vice President

APR-29-97 TUE 09:17     N█████H# 734-1450          FAX NO. 302█████6               P. 02

# CERTIFICATE OF AMENDMENT
## OF
## CERTIFICATE OF INCORPORATION
## OF
## LONG BEACH MORTGAGE COMPANY

Long Beach Mortgage Company, a corporation organized under the General Corporation Law of the State of Delaware (the "Corporation"), hereby certifies as follows:

1.      Article I of the Certificate of Incorporation of the Corporation is hereby amended to read in its entirety as follows:

### "ARTICLE I

### NAME OF CORPORATION

The name of this corporation is Ameriquest Mortgage Company"

2.      The amendment set forth has been duly approved by the Directors of the Corporation and by the Stockholders of the Corporation.

3.      The amendment set forth was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

4.      The foregoing amendment of Certificate of Incorporation has been duly approved by the stockholders of the Corporation in accordance with Section 242 of the Delaware General Corporation Law.

IN WITNESS WHEREOF, I, the undersigned, being the Secretary of the Corporation, for the purpose of amending the Certificate of Incorporation of the Corporation pursuant to Section 242 of the General Corporation Law of the State of Delaware, do make and file this Certificate, hereby declaring and certifying that the facts stated are true, and accordingly have hereunto set my hand, this 29th day of April, 1997.

_Norman R. Gritsch, Secretary_

s:\exec\docs\011003.20

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 04/29/1997
971137786 - 2409839





OF DELAWARE
TARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 08/26/1994
944161474 - 2410743

# AMENDED AND RESTATED CERTIFICATE OF INCORPORATION
## OF
# LONG BEACH FINANCIAL SERVICES COMPANY

The undersigned Corporation does hereby certify as follows:

1.    The name of the Corporation is Long Beach Financial Services Company, the name under which it was originally incorporated.

2.    The original Certificate of Incorporation of the Corporation was filed in the Office of the Secretary of State of the State of Delaware on June 17, 1994.

3.    This Amended and Restated Certificate of Incorporation has been duly adopted in accordance with Sections 242 and 245 of the General Corporation Law of the State of Delaware.

4.    The text of the Certificate of Incorporation of the Corporation is hereby amended and restated to read in its entirety as follows:

## ARTICLE I

## NAME OF CORPORATION

The name of the Corporation is Long Beach Financial Services Company.

## ARTICLE II

## REGISTERED OFFICE

The address of the registered office of the Corporation in the State of Delaware is 1209 Orange Street, Wilmington, County of New Castle. The name of the registered agent of the Corporation at such address is The Corporation Trust Company.

## ARTICLE III

## PURPOSE

The purpose of this Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of the State of Delaware ("GCL").

## ARTICLE IV

## AUTHORIZED CAPITAL STOCK

4.01    Number, Classes and Par Value of Shares.    The Corporation is authorized to issue two classes of stock designated "Common Stock" and "Preferred Stock," respectively. The total number of shares of stock that the Corporation is authorized to issue is 20,000,000. The number of shares of Common Stock that the Corporation is authorized to issue is 15,000,000, and the number of shares of Preferred Stock that the Corporation is




authorized to issue is 5,000,000. All shares of Common Stock and Preferred Stock shall have a par value of $.01 per share.

4.02  Designation of Series of Preferred Stock By Board of Directors.  The shares of Preferred Stock may be issued from time to time in one or more series. The Board of Directors is hereby granted the express authority to fix by resolution or resolutions the designations and number of shares constituting any such series and the powers, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, including without limitation the voting powers, dividend rights, conversion rights, redemption rights and liquidation preferences, of any series of shares of Preferred Stock, and to increase or decrease the number of authorized shares of any series subsequent to the issue of that series, but not below the number of shares of such series then outstanding. In case the authorized number of shares of any series shall be so decreased, the shares constituting such decrease shall resume the status which they had prior to the adoption of the resolution originally fixing the number of shares of such series. Shares of Preferred Stock that are redeemed, purchased, or otherwise acquired by the Corporation may be reissued except as otherwise provided by applicable law or the applicable certificate of designation.

## ARTICLE V

### LIMITATION OF DIRECTOR LIABILITY

To the fullest extent permitted by the GCL as the same exists or may hereafter be amended, a director of the Corporation shall not be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. The liability of a director of the Corporation to the Corporation or its stockholders for monetary damages shall be eliminated to the fullest extent permissible under applicable law in the event it is determined that Delaware law does not apply. The Corporation is authorized to provide by bylaw, agreement or otherwise for indemnification of directors, officers, employees and agents for breach of duty to the Corporation and its stockholders to the fullest extent permitted by applicable law. Any repeal or modification of this Article V shall not result in any liability for a director with respect to any action or omission occurring prior to such repeal or modification.

## ARTICLE VI

### BOARD POWER REGARDING BYLAWS

In furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind the Bylaws of the Corporation.

## ARTICLE VII

### ELECTION OF DIRECTORS

7.01  No Written Ballot.  Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

7.02  Cumulative Voting.  In the event the Corporation should be subject to the provisions of Section 708 (a), (b) and (c) of the California Corporations Code ("Code") by reason of the applicability of Section 2115 of the Code, then so long as the Corporation is subject to the provisions of said Section 2115, in any election of directors of the Corporation, a holder of any class or series of stock then entitled to vote in such election shall be entitled to

2

MAR-13-97 THU 11:53 AM  NG┬ ⌐ ╪ 734-1450          FAX NO. 30273  4148   *STATE OF DELAWARE*
                                                                        *SECRETARY OF STATE*
                                                                        *DIVISION OF CORPORATIONS*
                                                                        *FILED 09:00 AM 03/13/1997*
                                                                        *971082123 - 2410743*

## CERTIFICATE OF CHANGE OF LOCATION OF REGISTERED OFFICE
## AND OF REGISTERED AGENT

It is hereby certified that:

      1.  The name of the corporation (hereinafter called the "Corporation") is Long Beach Financial Services Company.

      2.  The registered office of the Corporation within the State of Delaware is hereby changed to 9 East Loockerman Street, City of Dover  19901, County of Kent.

      3.  The registered agent of the Corporation within the State of Delaware is hereby changed to National Registered Agents, Inc., the business office of which is identical with the registered office of the Corporation as hereby changed.

      4.  The Corporation has authorized the changes hereinbefore set forth by resolution of its Board of Directors.

Signed on March 12, 1997.

                                                       _____
                                 Jon Daurio, Vice President




authorized to issue is 5,000,000. All shares of Common Stock and Preferred Stock shall have a par value of $.01 per share.

4.02  Designation of Series of Preferred Stock By Board of Directors.  The shares of Preferred Stock may be issued from time to time in one or more series.  The Board of Directors is hereby granted the express authority to fix by resolution or resolutions the designations and number of shares constituting any such series and the powers, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, including without limitation the voting powers, dividend rights, conversion rights, redemption rights and liquidation preferences, of any series of shares of Preferred Stock, and to increase or decrease the number of authorized shares of any series subsequent to the issue of that series, but not below the number of shares of such series then outstanding.  In case the authorized number of shares of any series shall be so decreased, the shares constituting such decrease shall resume the status which they had prior to the adoption of the resolution originally fixing the number of shares of such series.  Shares of Preferred Stock that are redeemed, purchased, or otherwise acquired by the Corporation may be reissued except as otherwise provided by applicable law or the applicable certificate of designation.

## ARTICLE V

## LIMITATION OF DIRECTOR LIABILITY

To the fullest extent permitted by the GCL as the same exists or may hereafter be amended, a director of the Corporation shall not be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.  The liability of a director of the Corporation to the Corporation or its stockholders for monetary damages shall be eliminated to the fullest extent permissible under applicable law in the event it is determined that Delaware law does not apply.  The Corporation is authorized to provide by bylaw, agreement or otherwise for indemnification of directors, officers, employees and agents for breach of duty to the Corporation and its stockholders to the fullest extent permitted by applicable law.  Any repeal or modification of this Article V shall not result in any liability for a director with respect to any action or omission occurring prior to such repeal or modification.

## ARTICLE VI

## BOARD POWER REGARDING BYLAWS

In furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind the Bylaws of the Corporation.

## ARTICLE VII

## ELECTION OF DIRECTORS

7.01  No Written Ballot.  Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

7.02  Cumulative Voting.  In the event the Corporation should be subject to the provisions of Section 708 (a), (b) and (c) of the California Corporations Code ("Code") by reason of the applicability of Section 2115 of the Code, then so long as the Corporation is subject to the provisions of said Section 2115, in any election of directors of the Corporation, a holder of any class or series of stock then entitled to vote in such election shall be entitled to

2



as many votes as shall equal (i) the number of votes which (except for this Section 7.02 as to cumulative voting) such stockholder would be entitled to cast for the election of directors with respect to such stockholder's shares of stock, multiplied by (ii) the number of directors to be elected in the election in which such stockholder's class or series of shares is entitled to vote, and each shareholder may cast all of such votes for a single director or for any two or more of them as such stockholder may see fit. Except as set forth above in this Section 7.02, the stockholders of this Corporation shall not be entitled to cumulate votes in the election of directors.

**ARTICLE VIII**

**CORPORATE POWER**

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Amended and Restated Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred on stockholders herein are granted subject to this reservation.

IN WITNESS WHEREOF, the undersigned Corporation has executed this Amended and Restated Certificate of Incorporation effective as of August 25, 1994.

LONG BEACH BANK FINANCIAL SERVICES COMPANY

By: _____
Roland E. Arnall, Chairman of the Board
of Directors

ATTEST:

_____
Alan T. Leupp, Secretary

OA942210.185/20+

3

MAR-13-97 THU 11:53 AM  N⬛⬛# 734-1450        FAX NO. 30273⬛⬛      STATE OF DELAWARE
                                                                 SECRETARY OF STATE
                                                          DIVISION OF CORPORATIONS
                                                           FILED 09:00 AM 03/13/1997
                                                              971082123 - 2410743

## CERTIFICATE OF CHANGE OF LOCATION OF REGISTERED OFFICE
## AND OF REGISTERED AGENT

It is hereby certified that:

      1. The name of the corporation (hereinafter called the "Corporation") is Long Beach Financial Services Company.

      2. The registered office of the Corporation within the State of Delaware is hereby changed to 9 East Loockerman Street, City of Dover 19901, County of Kent.

      3. The registered agent of the Corporation within the State of Delaware is hereby changed to National Registered Agents, Inc., the business office of which is identical with the registered office of the Corporation as hereby changed.

      4. The Corporation has authorized the changes hereinbefore set forth by resolution of its Board of Directors.

Signed on March 12, 1997.

Jon Daurio, Vice President

APR-08-97 TUE 16:10    NO.  41450    FAX NO. 73414    P. 02

## CERTIFICATE OF AMENDMENT
### OF
### CERTIFICATE OF INCORPORATION
### OF
### LONG BEACH FINANCIAL SERVICES COMPANY

Long Beach Financial Services Company, a corporation organized under the General Corporation Law of the State of Delaware (the "Corporation"), hereby certifies as follows:

1.    Article I of the Certificate of Incorporation of the Corporation is hereby amended to read in its entirety as follows:

### "ARTICLE I

### NAME OF CORPORATION

The name of this corporation is Ameriquest Capital Corporation"

2.    The amendment set forth has been duly approved by the Directors of the Corporation and by the Stockholders of the Corporation.

3.    The amendment set forth was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

4.    The foregoing amendment of Certificate of Incorporation has been duly approved by the stockholders of the Corporation in accordance with Section 242 of the Delaware General Corporation Law.

IN WITNESS WHEREOF, I, the undersigned, being the Secretary of the Corporation, for the purpose of amending the Certificate of Incorporation of the Corporation pursuant to Section 242 of the General Corporation Law of the State of Delaware, do make and file this Certificate, hereby declaring and certifying that the facts stated are true, and accordingly have hereunto set my hand, this 8th day of April, 1997.

Norman R. Gritsch, Secretary

OA970920.109/2+

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 04:00 PM 04/08/1997
971113793 - 2410743