$05\ Cv\ 7/02$

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK



JUDGE SWAIN

INDEX NO. **05 CV 6189**

CHERYL WILLIAMS and DUVAL
NAUGHTON, on behalf of themselves and all
others similarly situated,

          Plaintiffs,

          v.

AMERIQUEST MORTGAGE COMPANY,

          Defendant.

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

RECEIVED
JUL 0 1 2005
U.S.D.C. S.D. N.Y.
CASHIERS

          Plaintiffs Cheryl Williams and Duval Naughton, on behalf of themselves and all

others similarly situated (hereinafter "Plaintiffs"), allege the following upon information and

belief, formed after a reasonable inquiry under the circumstances:

**I.    NATURE OF THE CASE**

          1.      Ameriquest Mortgage Company (hereinafter "Ameriquest" or

"Defendant"), has engaged and is engaged in uniform unfair, unconscionable, deceptive and

unlawful commercial practices in soliciting and closing residential mortgage transactions in the

State of New York and nationwide.

          2.      According to the 2003 and 2004 Mortgage Market Statistical Annuals,

Ameriquest was the third largest subprime lender by volume during the period October 1999

through December 2003, with $61.8 billion in total originations during the period. Based on

estimates from Ameriquest's securitization-filing, Ameriquest has risen to be the top "direct to

consumer" subprime mortgage originator in the United States and originated an estimated $16.84

- 1 -

billion in loans for the first 6 months of 2004, representing a 76% rise over the same period in 2003. This growth has occurred as a result of Ameriquest's unfair and predatory practices, alleged herein.

3.    While Ameriquest claims that its philosophy is "Do the Right Thing," Ameriquest's conduct begs the question – the right thing for whom? Ameriquest's policies and common conduct are designed exclusively to unfairly and unlawfully increase its own profits at the expense of the homeowners Ameriquest purports to assist.

4.    Defendant targets consumers for predatory, "subprime" equity loans and induces borrowers to enter into unfair and deceptive residential mortgages without regard for the homeowners' interests or ability to pay. By its predatory loan practices, Ameriquest engages in a persistent "bait and switch" scheme through which it lures borrowers with promises of favorable interest rates, monthly payments and/or loan terms, and then switches the terms at closing to less favorable ones.

5.    Plaintiffs and the Class members each received a loan which, to their surprise, contained one or more of the following unfavorable terms which were not disclosed:

a.    A confusing and unfair variable interest rate structure which provides only for an increase and not decrease in the borrower's interest rate;

b.    A misleading charge for "discount points" or a "discount fee" often totaling thousands of dollars added to the principal of the loan, although Ameriquest provided no "discount" to the interest rate;

c.    A prepayment penalty that hinders borrowers from refinancing on better terms with other lenders; and

-2-

       d.     duplicative and excessive costs and closing fees in amounts designed to strip home equity and prevent borrowers from refinancing without incurring high costs.

       6.     Ameriquest also routinely fails to provide required disclosures, including the statutorily mandated Notice of Right to Cancel, and circumvents statutory protections by failing to leave a true copy of completed loan documents in borrowers' possession so that borrowers cannot review the loan terms.

       7.     When borrowers inquire at closing about why they are not receiving their loans on the promised terms, they are typically – and falsely – promised early refinancing on more favorable terms.

       8.     Ameriquest's unfair practices allow Ameriquest to profit by leaving borrowers with a three-way Hobson's choice. Either the borrower can 1) choose to remain in a loan with unacceptable terms; 2) find another lender offering better terms and pay Ameriquest a substantial and unjustified prepayment penalty while losing equity on additional closing costs; or 3) refinance with Ameriquest and thereby provide Ameriquest with an opportunity to capitalize the points and closing costs from the first loan while charging another set of points and/or closing costs in an equal or larger amount.

       9.     By failing to disclose to the Plaintiffs prior to the loan closing that they would not receive loans on the terms originally promised, Ameriquest violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681m(a) and the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691(d).

452833.3

10.      By failing to give people complete and accurate information about their right to cancel the loan, Ameriquest violated the Truth in Lending Act ("TILA"), 15 U.S.C. § 1635.

11.      By virtue of this conduct, Plaintiffs and the Class have been harmed and continue to incur damages and suffer harm.  Through this action, Plaintiffs seek, on behalf of themselves and all others similarly situated, damages, restitution, a declaration of the right to rescind, attorneys fees, costs, and any other relief the Court deems proper.

## II.      JURISDICTION AND VENUE

12.      This Court has personal jurisdiction over Defendant named herein because a substantial portion of the wrongdoing alleged in this Complaint took place in the Southern District of New York, and Defendants are authorized to and regularly do business in the Southern District of New York.

13.      This is an action for violations of 15 U.S.C. § 1601 *et seq.* (Truth in Lending Act), 15 U.S.C. § 1691 *et seq.* (Equal Credit Opportunity Act), 15 U.S.C. § 1681m(a) (Fair Credit Reporting Act), and related state laws.  This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise from federal law.  Additionally, there is federal jurisdiction over the federal statutory claims pursuant to 15 U.S.C. §§ 1640, 1681p, and 1691e.  This Court also has jurisdiction of this action under 28 U.S.C. § 1332, in that the matter in controversy exceeds $5,000,000, and there are members of the class who are citizens of different states than Defendants.  The Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

14.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial portion of the events and omissions giving rise to this Complaint occurred within the Southern District of New York.  Plaintiff Williams and numerous other members of

-4-

the Class reside in the Southern District of New York, and their mortgage loans that are the

subject of this Complaint, were solicited and closed in this judicial district.

## III.    THE PARTIES

### A.    Plaintiffs

15.    Plaintiff Cheryl Williams is a resident of New York, New York, and has

been a victim of Ameriquest's practices, as alleged herein.

16.    Plaintiff Duval Naughton is a resident of Brooklyn, New York, and has

been a victim of Ameriquest's practices, as alleged herein.

### B.    Defendants

17.    Defendant Ameriquest Mortgage Company is a privately-held Delaware

corporation that has its principal place of business in Orange, California.  Ameriquest Mortgage

Company is a wholly-owned subsidiary of Ameriquest Capital Corporation.

18.    Ameriquest is the nation's largest privately-held subprime lender.

Ameriquest Mortgage Company has more than 270 offices nationwide.  Ameriquest Mortgage

Company conducts business in New York and has more than 15 offices throughout New York

State, including offices at 15 Metro Tech Center, Brooklyn, New York 11201 and at 245 Park

Avenue, 24th Floor, New York, New York 10167.

## IV.    AMERIQUEST'S PATTERN AND PRACTICE OF UNFAIR, UNCONSCIONABLE, UNLAWFUL, AND DECEPTIVE PRACTICES

19.    Ameriquest has engaged in and continues to engage in a uniform common

plan and scheme to prey upon unsuspecting consumers by routinely causing borrowers to enter

into inappropriate residential loans with unfavorable terms, misleading and inappropriate

"discount" fees, high and adjustable interest rates, and excessive loan principal compared to

equity and ability to pay.

-5-

452833.3

A.    **Bait And Switch Practices of Ameriquest**

20.    Ameriquest engages in "bait and switch" tactics in regard to its residential loan transactions.  Ameriquest systematically baits customers into residential mortgage loan transactions with promises of fixed interest rates, low interest rates, low or no fees, lower monthly payments compared to then current payments, no prepayment penalties, and/or the existence or absence of particular terms.  When the paperwork is presented to customers for signature at closing, the terms are contrary to the terms promised.  Frequently, borrowers are unaware that the terms of the mortgage documents do not match Ameriquest's prior representations.

21.    This practice goes hand in hand with Ameriquest's uniform practice of failing to make statutory disclosures and misrepresenting or concealing loan terms, as well as its aggressive and unfair sales tactics.  While each practice is separately unlawful and unfair, in tandem these practices allow Ameriquest to systematically close loans that benefit Ameriquest to the detriment and misfortune of Plaintiffs and the Class.

22.    After presenting new or different loan terms, if the borrower becomes aware of the changes, Ameriquest engages in scare and pressure tactics to cause customers to proceed with the transaction anyway.  Ameriquest further uses their borrowers' concern about loan terms in the initial transaction as an opportunity to bait the hook for a second loan, by promising an early refinancing on better terms.  The refinance loans then capitalize finance charges, provide an excuse for new and additional points and other closing costs and provide an opportunity for Ameriquest to reap other additional hidden profits at their borrowers' expense.

23.    Ameriquest misleads the borrowers into signing loan documents without reading them by misrepresenting their contents and telling borrowers there is no need or time to read them and pressuring them to "just sign the papers."

-6-

452833.3

24.     While Ameriquest purports to provide a three-day right of rescission, they fail to provide notice of this right in the legally mandated form with full information about the legal deadline for cancellation. In many cases, Ameriquest fails to timely provide the legally required copies of the appropriate cancellation forms.

25.     Ameriquest also fails to timely deliver copies of various loan papers, including required disclosures under the Truth in Lending Act, until after the loan is consummated. This prevents consumers from understanding the loan terms, including most importantly, the true cost of the loan.

26.     Ameriquest also has a uniform practice of removing certain documents, such as those relating to the prepayment penalty, before presenting the documents to the customer for signing. For this reason and others, customers are systematically denied any meaningful opportunity to discover that the terms on the final documents do not match the prior representations.

**B.     Ameriquest's Sales and Marketing Scheme**

27.     Ameriquest has a business practice of using oppressive and unfair marketing techniques to prey upon low income homeowners in New York and nationwide.

28.     Ameriquest trains and encourages its Account Executives to engage in any conduct necessary to close the greatest number of loans as quickly as possible and to maximize the total loan principal. Ameriquest loan officers, called account executives ("AEs"), across the country, including those in New York, receive daily leads on new customers that are generated by software at Ameriquest's Orange, California, headquarters. These leads target homeowners who are carrying both a mortgage and significant credit card and/or other consumer debt; persons who have mobile home mortgages; persons with less than perfect credit; and other financially-vulnerable persons. These homeowners are solicited through repeated mailers, telephone calls,

-7-

and/or personal visits by Ameriquest sales personnel, all inviting them to consolidate their debts or to obtain money for expenses, with false and misleading promises of more favorable loan terms and/or reduced monthly payments. Ameriquest profits by obtaining high fees upfront and high interest rates in the interim, and often by selling its loan portfolios to other companies.

29.    Ameriquest systematically trains its sales personnel through standardized sales presentations (videos) developed under the control of Defendant's corporate headquarters in Orange, California as well as by use of the movie "Boiler Room" which depicts unethical and illegal high-pressure sales practices by a securities brokerage firm. These videos demonstrate high-pressure mortgage sales, while failing to train employees on the legal requirements and regulations for mortgage lending.

30.    Ameriquest also trains its sales personnel to routinely rush borrowers through the lengthy, complex documentation of the regulated closing process so as to divert the borrowers' attention from the documented terms of the loans. Moreover, Ameriquest trains its Account Executives to overcome objections raised by borrowers at closing by such tactics as threatening delay or cancellation of the closing, by offering immediate cash pending the closing of the loan, and by assuring borrowers that they can refinance with better terms after improving their credit score, without disclosing that they could be subject to the prepayment penalty, higher interest rates and other fees if they did so.

31.    At all times relevant to this action, Ameriquest's uniform and fundamental business strategy with respect to the sale of home-secured loans has been to:

a.    uniformly hold out to all prospective customers, through the use of misleading promotions and material omissions regarding loan terms, that refinancing and/or

-8-

consolidating their debts with Ameriquest will be beneficial and will save them money when in fact it will not;

        b.     employ aggressive, misleading, and unfair high-pressure sales tactics to obfuscate loan terms both prior to closing and at closing, if and when customers question loan terms, in order to force the customers to close the loan;

        c.     force borrowers into mortgage loan that include one or more of the following terms: (1) a high and/or non-disclosed adjustable interest rate; (2) a "discount" fee that does not lower the interest rate; (3) excessive closing fees; and/or (4) a prepayment penalty provision;

        d.     sell loans to these homeowners in amounts so high in relation to the value of their homes that the resulting debt-to-value ratio (coupled with prepayment penalties and other restrictions) effectively strips their homes of equity and prevents the borrowers from refinancing their loans with Ameriquest's competitors, often by inflating appraisal values or the borrowers' income or asset statements; and

        e.     engage in "flipping," or aggressive solicitation of targeted borrowers, including existing Ameriquest customers, to refinance existing loans without significant benefit to the homeowner, thus generating additional debt, capitalizing previously charged points and fees, incorporating new and excessive costs and fees into the principal of the loan, and often increasing the borrower's interest rate.

        32.     Because Ameriquest profits from the origination and "flipping" of loans, and the subsequent sale of those loans to investment bankers and others as assets for mortgage-based securities, Ameriquest has little concern for the actual risk that the loans might default or

with the continued profitability of the loans after origination, except to the extent that

Ameriquest can induce existing borrowers to borrow more.

       33.    Ameriquest unfairly and deceptively holds out its mortgage loans as sound

financial transactions that will save borrowers money.  Ameriquest fails to disclose prior to

closing and/or intentionally obfuscates and/or conceals before and at closing the following:

       a.    required TILA disclosures clearly and conspicuously, in a form

that borrowers can understand, in order to mislead consumers as to the true terms and costs of

their loan transactions;

       b.    the high and/or adjustable interest rates charged on its loans, as

well as the risks associated with adjustable rate mortgage ("ARM") loans;

       c.    the high and deceptive "discount" fees and closing fees routinely

added to the loan principal;

       d.    the fact that, under 15 U.S.C. § 1635(a), 12 C.F.R. § 226.23(b)(1),

borrowers have the right to rescind certain transactions up to three days following the

consummation of the transaction or the delivery of the information and disclosures required by

statute;

       e.    the existence of a prepayment penalty, and that such prepayment

penalty would make refinancing impossible and/or highly unfavorable for the borrower;

       f.    the fact that the borrowers would have to pay, out of pocket, the

cost of homeowners' insurance and property taxes that legitimate lenders include in monthly

escrow payments, and instead implies or allows borrowers to believe that the monthly payment

includes these costs; and

452833.3

g.    the fact that far from saving borrowers money (as Ameriquest systematically claims), the Ameriquest loans, increase the total amount of debt outstanding, exacerbate overall interest obligations, and place vulnerable borrowers at high risk of foreclosure.

34.    In addition, Ameriquest routinely fails to provide required disclosures to borrowers prior to closing — including, but not limited to, the HUD-1 statement, Notice of Right to Cancel, a "good faith" Good Faith Estimate, settlement process information booklet and other disclosures required under TILA — ensuring that borrowers have no meaningful opportunity to review them or to learn the true terms and costs of their loan transactions.

C.    **Ameriquest's Compensation System**

35.    Ameriquest has designed its compensation system to reward its AEs for "upselling" customers' loans, providing incentives for AEs to aggressively sell products in order to increase the amounts loaned to the maximum permitted by Ameriquest's underwriting goals, irrespective of the amounts requested by borrowers or supported by the actual value of the home. The effect of these "upsells" has been to "close the back door" on Ameriquest's customers by making loans that cannot be refinanced by Ameriquest's competitors.

36.    Ameriquest's compensation scheme also rewards AEs based on quantity of loans closed per month. The minimum monthly quotas have risen consistently over time, reaching levels that are significantly higher than the number of loans closed by sales personnel at other companies. Given that Ameriquest's AEs must reach the minimum quotas in order to be paid at any reasonable rate, and that the quotas are very high, Ameriquest's policy all but ensures that its AEs will systematically engage in unfair and deceptive tactics to meet company quotas, with company knowledge of this widespread practice.

-11-

## V.     THE TRANSACTIONS WITH PLAINTIFFS

### A.     Cheryl Williams

37.     Cheryl Williams owns a home at 2611 Frederick Douglas Blvd.,
New York, New York.

38.     In or around May 2003, Cheryl Williams responded to a solicitation from
Ameriquest and contacted Defendant about refinancing an existing mortgage loan. When Ms.
Williams informed the Ameriquest representative that the interest rate on her current loan was
7.6%, the AE assured her that if she refinanced with Ameriquest, she would receive a lower rate
than what she was currently paying, and that no prepayment penalty would be imposed. In
accordance with Ameriquest's common practice, the AE encouraged Ms. Williams to
consolidate her other debt into the mortgage. Based on Ameriquest's representations, and in
reliance thereon, Ms. Williams agreed to consolidate her debt and proceed to closing.
Ameriquest failed to provide Ms. Williams with any documents or disclosures, including any
HUD-1 or Good Faith Estimate, prior to closing.

39.     Shortly after the initial contact, Ameriquest met with Ms. Williams to
close the loan. Contrary to the express assurances and representations made by Ameriquest, the
closing documents reflected an interest rate of 7.8%, which was higher than the rate she was then
paying. Despite the fact that the AE had encouraged Ms. Williams to consolidate her other
debts, the AE justified the higher rate by stating that it was due to the fact that she was
consolidating other debt into the loan. The Ameriquest AE then promised Ms. Williams that if
she took the loan with the 7.8% interest rate, Ameriquest could lower the interest rate to below
7% in 2004 if she paid her mortgage on time.

40.     Ms. Williams was rushed through the closing process and did not have a
sufficient or meaningful opportunity to review the loan documents. Based on Ameriquest's

452833.3

representations that her interest rate would be lowered in 2004, and in reliance thereon, Ms. Williams proceeded to refinance her loan for a fixed rate of 7.8%. Ms. Williams' monthly payment under her Ameriquest loan was $760.96, compared to her prior monthly payment of approximately $575.00.

41.    In or around May 2004, Ms. Williams contacted Ameriquest to obtain the lower interest rate she was promised. The Ameriquest representative told Ms. Williams that, even though she had made timely payments, she would need to refinance her existing loan and pay additional fees.

42.    Ms. Williams later discovered that despite Ameriquest's promises to the contrary, Ameriquest inserted a prepayment penalty in her mortgage loan. Ameriquest did not disclose or explain the prepayment penalty provision to Ms. William prior to or at the closing. Ms. Williams was not aware of the prepayment penalty until she was forced to pay the penalty when she later refinanced with another company in or about September 2004.

43.    In addition, the cost of the mortgage included a misleading and improper "discount" fee which did not lower the interest rate charged, as well as excessive loan processing fees.

44.    Ms. Williams did not receive a discount in exchange for her payment of discount points. Nor was she offered a loan at a higher rate without payment of points so that she could evaluate whether payment of "discount" points in exchange for a lower rate would be a sound financial decision.

-13-

45.    Ms. Williams's mortgage included the following closing costs:

| FEE/CHARGE | AMOUNT |
|---|---|
| Loan Discount Fee | $1,518.00 |
| Appraisal Fee | $360.00 |
| Lenders Processing Fee | $626.00 |
| Application Fee | $360.00 |
| Recording Fees | $235.00 |
| **TOTAL** | $3,099.00 |

**B.    Duval Naughton**

46.    Duval Naughton owns a home at 938 Bushwick Ave., Brooklyn, New York.

47.    In or about November 2003, Duval Naughton refinanced an existing mortgage loan through Ameriquest. At the time of this refinance, Ameriquest gave Mr. Naughton an adjustable interest rate of 5.4 percent.

48.    In or around August 2004, Mr. Naughton contacted Ameriquest regarding obtaining a home equity loan. The Ameriquest representative told Mr. Naughton that, in lieu of a home equity loan, Ameriquest would lower the interest rate on Mr. Naughton's existing Ameriquest loan and change it to a fixed rate if Mr. Naughton agreed to refinance again. The Ameriquest representative offered Mr. Naughton a fixed interest rate of 5% to refinance.

49.    Based on Ameriquest's representations, and in reliance thereon, Mr. Naughton proceeded to closing. Ameriquest failed to provide Mr. Naughton with any documents or disclosures, including a Good Faith Estimate or ARM disclosure, prior to closing. In addition, Ameriquest did not provide Mr. Naughton with any documents indicating that an appraisal had been done on his residence. Upon information and belief, an appraisal was never done on Mr. Naughton's residence at the time of this refinance transaction.

-14-

50.    Shortly before closing, Mr. Naughton was told that the interest rate on his refinanced loan would be slightly higher than the rate Ameriquest had initially represented. The AE justified what Ameriquest characterized as a minor change by stating it was due to problems with Mr. Naughton's credit score, despite the fact that Mr. Naughton's credit information had been known to Ameriquest throughout the loan transaction process. The Ameriquest representative promised Mr. Naughton that if he refinanced with Ameriquest and paid his mortgage on time, Ameriquest would lower Mr. Naughton's rate to a fixed interest rate of 5% within six months.

51.    At the closing, a notary met with Plaintiff Naughton. The AE was not present at the closing and did not review any documents or disclosures with Mr. Naughton. Ameriquest did not send Mr. Naughton copies of the signed closing documents.

52.    Contrary to the express assurances and representations made by Ameriquest, the closing documents reflected an interest rate of 6.6%, which was significantly higher than what he was told initially, higher than the rate he was later told he would be given, and significantly higher than the 5.4% interest rate of his prior loan. In addition, the documents reflected an adjustable interest rate instead of the fixed rate Ameriquest had promised.

53.    Mr. Naughton felt pressure to sign the mortgage documents, and could not back out of the loan because he had already made firm commitments to pay other obligations through the refinancing with Ameriquest.

54.    Mr. Naughton's monthly payment under his current Ameriquest loan is approximately $2,062.33, compared to his prior monthly payment of $1,545.00.

-15-

55.　　The cost of the mortgage also included an improper and misleading "discount" fee which did not reduce the interest rate charged, an unwarranted appraisal fee and excessive loan processing fees.

56.　　Mr. Naughton did not receive a discount in exchange for his payment of discount points. Nor was he offered a loan at a higher rate without payment of points so that he could evaluate whether payment of "discount" points in exchange for a lower rate would be a sound financial decision.

57.　　Mr. Naughton's mortgage included the following closing costs:

| FEE/CHARGE | AMOUNT |
|---|---|
| Loan Discount Fee | $8,922.30 |
| Appraisal Fee | $207 |
| Flood Search Fee | $16 |
| Lenders Processing Fee | $626 |
| Application Fee | $360 |
| Recording Fees | $132 |
| Courier Fee | $125 |
| **TOTAL** | $10,388.30 |

58.　　Ameriquest entered false and fabricated information on Mr. Naughton's loan application and inflated Mr. Naughton's net worth on the application to enable the closing of the loan. Mr. Naughton's net worth was listed on his application as $324,898.74, taking into account the full value of his home, but not accounting for the amount of the mortgage owed.

59.　　Additionally, Ameriquest is misapplying payments to Mr. Naughton's current loan and, despite Mr. Naughton's explicit instruction, has failed to apply extra payments to the principal balance.

60.　　Ameriquest is again seeking to refinance Mr. Naughton's loan.

-16-

61.     As a result of Ameriquest's conduct, Mr. Naughton has suffered and continues to suffer actual damages and other harm.

## VI.    CLASS ACTION ALLEGATIONS

62.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 on their own behalf and on the behalf of all other members of the classes described below.

63.     Plaintiffs seek certification of a nationwide class consisting of all Ameriquest borrowers across the country except those who are Class members in AMERIQUEST CASES, Judicial Council Coordination Proceeding No. 4162 (Cal. Sup. Ct., County of San Mateo). The nationwide class is defined as:

> All persons (i) who presently own, or during the Class Period owned, property (including mobile homes) in the United States, and (ii) who entered into a mortgage loan transaction relating to such property with any named Defendant or their predecessors, directly or indirectly, at any time between July 1, 1999, and the present (the "Nationwide Class").

> Excluded from the Nationwide Class are class members in Ameriquest Cases, Judicial Council Coordination Proceeding No. 4162 (Cal. Sup. Ct., County of San Mateo); any judicial officer assigned to this matter; Defendant; the parents, subsidiaries and affiliates, officers and directors of Defendant or any entity in which Defendant has a controlling interest; and the legal representatives, successors, or assigns of any such excluded persons.

64.     Plaintiffs Naughton and Williams, on behalf of themselves and all others similarly situated, seeks certification of the following Subclass:

> All persons (i) who presently own, or during the Class Period owned, property (including mobile homes) in the State of New York, and (ii) who entered into a mortgage loan transaction relating to such New York property with any named Defendant or their predecessors, directly or indirectly, at any time between – July 1, 1999, and the present (the "New York Subclass").

-17-

452833.3

Excluded from the New York Subclass are any judicial officer assigned to this matter; Defendant; the parents, subsidiaries and affiliates, officers and directors of Defendant or any entity in which Defendant has a controlling interest; and the legal representatives, successors, or assigns of any such excluded persons.

65.　　The members of the Nationwide Class and New York Subclass (together, "Class") are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are hundreds of thousands of Class members and tens of thousands of Subclass members.  Detailed information on the Class can be ascertained through appropriate discovery and from records maintained by Defendant and its agents.

66.　　Plaintiffs' claims are typical of the claims of the members of the Class, as Plaintiffs and all other members of the Class and Subclass sustained damages arising out of the same wrongful conduct by Ameriquest.  Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class and Subclass and have retained counsel competent and experienced in class action and consumer litigation.

67.　　A class action is superior to other available methods for the fair and efficient adjudication of Defendant's uniform unlawful practices because joinder of all members is impracticable.  Prosecution of separate actions by individual Class and Subclass members would create an inherent risk of inconsistent and varying adjudications, with the concomitant risk of the establishment of incompatible and conflicting standards of conduct for Defendant.  In addition, due to the vastly unequal market power between the parties, and the fact that many Class members are in ongoing commercial relationships with Defendant, a Class action may be the only way, as a practical matter, that the cases will be prosecuted.  Plaintiffs foresee no significant difficulties in managing this action as a class action.

452833.3

68.     Common questions of law and fact exist as to all members of the Class and Subclass and predominate over any questions affecting solely individual Class and Subclass members.  Among the questions of law and fact common to the Class and/or Subclass are:

a.     Whether Defendant systematically failed to provide the disclosures required by law, including TILA disclosures, clearly and conspicuously, in writing and in a form that Class Members can keep and/or understand;

b.     Whether Defendant has been or are engaged in a "bait and switch" scheme, in which Class Members have been lured in with promises of a particular set of loan terms, and are then given different and far less beneficial terms;

c.     Whether documents, contracts, and practices relating to the transactions between members of the Class and Defendant were unfair, unconscionable, deceptive, untrue, misleading, or omitted material facts and disclosures;

d.     Whether Defendant misrepresented, concealed, and/or failed to disclose loan terms;

e.     Whether Defendant misled Plaintiffs and the Class in connection with marketing, solicitation, sale, operation, and administration of the mortgage loans; and

f.     Whether Plaintiffs and the Class are entitled to the imposition of a constructive trust as a result of, among other things, Defendant's unjust enrichment.

g.     Whether defendants have been or are engaged in unfair and unlawful business practices, and whether the alleged conduct violated the N.Y. Gen. Bus. Law § 349 or herein violated other applicable laws;

h.     Whether declaratory relief giving Class Members the right to rescind their mortgage loans should be issued;

i.      Whether Plaintiffs and the Class are entitled to damages and the appropriate measure of such damages;

j.      Whether Plaintiffs and the Class are entitled to punitive damages.

## CAUSES OF ACTION

## COUNT I

**Violations of the Truth in Lending Act, 15 U.S.C. § 1601, et seq.
and Federal Reserve Regulation Z, 12 C.F.R. § 226.1 et seq.
(By Plaintiffs on Behalf of Themselves and the Class)**

69.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

70.     Defendant Ameriquest Mortgage Company is a creditor within the meaning of the Truth and Lending Act ("TILA") as implemented by Regulation Z.

71.     Defendant Ameriquest Mortgage Company violated TILA and Regulation Z by:

a.      Failing to provide Plaintiffs and Class Members with material disclosures in a form they could keep prior to consummation; and

b.      For non-purchase money mortgages, failing to provide Plaintiffs and Class Members with notices of right to cancel that were clear, conspicuous or consistent with the forms and regulations of the Federal Reserve Board found at 12 C.F.R. 226.23 (Regulation Z) and Appendix H.

72.     Any and all statute of limitations relating to disclosures and notices required under 15 U.S.C. § 1601 *et seq.* are tolled due to the Defendant's failure to effectively provide the disclosures and notices.

452833.3

73.     As a direct and proximate result of these violations, Plaintiffs and Class Members have suffered and continue to suffer actual damages, including, but not limited to, all amounts paid or to be paid to Defendant, excluding principal payments, and are also entitled to statutory damages.  Plaintiffs and the Class also seek declaratory relief that they have a right to rescind that may be exercised within three years from the date of closing.

### COUNT II

**Violation of Equal Credit Opportunity Act, 15 U.S.C. § 1691(d)**
**(By Plaintiffs on Behalf of Themselves and the Class)**

74.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

75.     Defendant Ameriquest is a creditor within the meaning of 15 U.S.C. § 1691a(e).

76.     Plaintiffs and the Class were applicants within the meaning of 15 U.S.C. § 1691a(b).

77.     Ameriquest violated 15 U.S.C. § 1691(d) as to Plaintiffs and the Class in that it did not provide them with the notice of adverse action as required by the provision when Ameriquest refused to grant credit to Plaintiffs and the Class on the terms requested, but pursuant to its bait and switch tactics, provided substantially different terms.

78.     As a result of Ameriquest's conduct, Plaintiffs and the Class have suffered actual damages, and are entitled to recover such actual damages as well as punitive damages, equitable and declaratory relief, costs and attorney fees.

452833.3

## COUNT III

### Violation of Fair Credit Reporting Act, 15 U.S.C. § 1681m(a)
### (By Plaintiffs on Behalf of Themselves and the Class)

79.     Plaintiffs reallege and incorporate the preceding paragraphs.

80.     Ameriquest is a user of consumer reports from consumer reporting agencies, in connection with the extension of credit to consumers, for purposes of 15 U.S.C. § 1681a.

81.     Ameriquest's failure to provide credit on the terms in initially promised to Plaintiffs and the Class, and to instead offer credit at less favorable more costly terms, constituted an adverse action, pursuant to 15 U.S.C. § 1681a(k).

82.     The adverse action taken by Ameriquest was based wholly or partly on information contained in a consumer report, or alternatively was based on information obtained from a person other than a consumer reporting agency, bearing upon the credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living of the Plaintiffs and class members.

83.     Ameriquest failed to provide notices of adverse action to each of the Plaintiffs and class members as required by 15 U.S.C. § 1681m(a).

84.     In the alternative, Ameriquest violated the Fair Credit Reporting Act ("FCRA") by failing to provide adverse action notices which provided an accurate or meaningful description of the basis for such adverse taken, or which otherwise fail to comply with FCRA.

85.     Ameriquest's failure to comply with 15 U.S.C. § 1681m(a) was willful.

86.     In the alternative, Ameriquest's failure to comply with 15 U.S.C. § 1681m(a) was negligent.

452833.3

87.     The Plaintiffs and class members suffered damages as a result of Ameriquest's failure.

## COUNT IV

### Unjust Enrichment
### (By Plaintiffs on Behalf of Themselves and the Class)

88.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

89.     By its wrongful acts and omissions, Defendant Ameriquest Mortgage Company has been unjustly enriched at the expense of Plaintiffs and the Class.

90.     Through their mortgage payments on the predatory and unfair mortgage loans described herein, Plaintiffs and Class members have been required to pay Defendant excessive fees, inflated interest rates and monthly payments higher than what they were promised.  As such, Plaintiffs and the Class have conferred benefits upon Ameriquest.

91.     Defendant Ameriquest has knowledge of these benefits that Plaintiffs and the Class have conferred and continue to confer upon them; and Defendant has accepted and retained such benefits.

92.     Due to the circumstances described herein, it would be inequitable, unjust and unfair for Defendant to retain the benefits conferred upon it by Plaintiffs and the Class.

93.     Plaintiffs and the Class seek restitution from Defendant and seek an order of this Court requiring that Ameriquest disgorge all profits, benefits, and other compensation obtained through its wrongful conduct.

## COUNT V

### Unfair, Unlawful, and Deceptive Business Practices in
### Violations of New York Gen. Bus. Law § 349
### (By Plaintiffs Naughton and Williams on Behalf of Themselves
### and the New York Subclass only)

94.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

95.     N.Y. Gen. Bus. Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

96.     N.Y. Gen. Bus. Law § 349 (h) provides that "any person who has been injured by reason of any violation of this section may bring . . . an action to recover his actual damages or fifty dollars, whichever is greater . . . The court may award reasonable attorney's fees to a prevailing plaintiff."

97.     Ameriquest systematically engages in materially deceptive practices towards consumers, including but not limited to:

a.     Marketing and selling mortgage loans to Plaintiffs and the New York Subclass in a manner intended to hide the true cost of various loan terms and the true disadvantages of the loan terms;

b.     Failing to provide consumers with good faith estimates of the closing costs, prior to closing;

c.     Presenting incomplete or misleading information related to the cost of loans, particularly in comparison with existing obligations;

d.     Failing to provide required disclosures prior to the closing of the loans;

e.      Presenting different unfavorable loan terms to borrowers only at closing so as to put consumers in a position where they have no choice but to accept the unfavorable loan terms; and

f.      Unilaterally charging discount points that are not justified by any discount to the interest rate provided to Plaintiffs and the New York Subclass.

98.      By virtue of the patterns of deceptive conduct alleged herein, Ameriquest has engaged in consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which has resulted in consumer injury, has broad adverse impact on the public at large, and harmed the public interest of New York State.

99.      Defendant Ameriquest's deceptive conduct caused injury to Plaintiffs and the New York Subclass. Plaintiffs and the Subclass seek actual damages for their injuries caused by these violations in an amount to be determined at trial.

100.      Defendant's conduct, as described above, entitles Plaintiffs to an award of attorneys' fees pursuant to N.Y. Gen. Bus. Law § 349 (h).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Nationwide Class and New York Subclass, respectfully pray for judgment against Defendant as follows:

1.      Certification of the case as a class action on behalf of the proposed Nationwide Class and New York Subclass, and designation of Plaintiffs as Nationwide Class and Subclass representatives and their counsel as Nationwide Class Counsel and Subclass Counsel;

2.      Restitution and disgorgement according to proof;

3.      Actual and statutory damages according to proof;

-25-

4.    Declaratory judgment declaring that Defendant's conduct is unlawful and declaring Plaintiffs and Nationwide Class Members the right to rescind their loan contracts with Defendant;

5.    Prejudgment interest at the applicable rates;

6.    Reasonable attorneys' fees and costs; and

7.    All such other and further relief the court deems proper and just.

### DEMAND FOR JURY TRIAL

Plaintiffs and the Class demand a jury trial in this action for all claims so triable.

Dated: July 1, 2005

Respectfully submitted,

Rachel Geman (RG 0998)
Gena E. Wiltsek (GW 6653)
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
780 Third Avenue, 48th Floor
New York, NY 10017-2024
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

Kelly M. Dermody
Caryn Becker
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1100
Facsimile: (415) 956-1008

452833.3

Gary Klein
RODDY, KLEIN & RYAN
727 Atlantic Avenue, 2nd Floor
Boston, MA  02111
Telephone:  (617) 357-5500
Facsimile:  (617) 357-5030

Laurence Tien
Kamran Mashayekh
THE TIEN LAW FIRM, LLP
10235 West Little York Road, Suite 470
Houston, TX 77040
Telephone:  (713) 937-0223
Facsimile:  (713) 937-0220

Attorneys for Plaintiffs and the Class

452833.3